## Phelan *versus* Moss.

1. Moss signed a note payable to Benton or bearer, which was a fraud on Moss. Phelan bought it from a holder bonâ fide for value, and without notice of the fraud. *Held*, that he could recover from Moss.
2. A holder of a negotiable note bonâ fide for value, without notice, can recover it, notwithstanding he took it under circumstances which ought to excite the suspicion of a prudent man.
3. In order to destroy such holder's title, it must be shown that he took the note malâ fide.
4. The doctrine as to the title of the holder of a note, fraudulent as between the original parties, discussed, and the authorities examined in this case.
5. Gill *v.* Cubitt, 3 B. & C. 466, not law in Pennsylvania: Beltzhoover *v.* Blackstock, 3 Watts 20, criticised.

November 15th 1870. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the Court of Common Pleas of *Greene county:* Of October and November Term 1870, No. 205.

This was an action of assumpsit brought, December 11th 1868, by R. H. Phelan against Jennings J. Moss.

On the trial, before Gilmore, P. J., the plaintiff having given evidence of the handwriting of the defendant, gave in evidence the following note, viz. :—

" Six months after date, I promise to pay to George W. Benton or bearer two hundred and fifty dollars, for value received, with use, without defalcation. Township of Aleppo, dated June 10th 1868.

" JENNINGS J. MOSS."

(15 cent stamps cancelled by writing on them, June 10th 1868.)

The plaintiff testified that he bought the note, November 16th 1868, from a man who said his name was W. B. Goff; he gave $100 for it; Goff said he did not know what the note was given for, he had got it in New York in a trade.

The defendant then gave evidence under objection and excep-

[Phelan *v.* Moss.]

tions, viz. : The defendant testified that he never gave the note; that he did not write the signature.   In June 1868 he met a man named Benton, he was riding in a carriage, and asked defendant to be an agent for selling washing machines, telling him he would give him half the price of the machines sold.   The defendant consented, the machines were to be sent by express to Cameron. The man said he wished something to show the agreement; he wrote an instrument and read it to the defendant; at the end of the contract defendant was to give him half the price of the machines sold; defendant signed it, he did not read it, not having his spectacles; the paper was "as large as a half sheet."   The machines never came to Cameron; defendant saw no stamps on it.

H. McKay testified that about the same time a man met him with a similar proposition, to which he consented; the man said there was usually an agreement with agents; he produced a paper partly printed, and offered witness pen and ink to sign it; witness discovered that the paper could be separated, and the lower part become a note; witness then refused to sign; shortly after, the defendant passed along on the same road on which the man went; the note in suit was in the same form as that shown to the witness. There was other evidence of a similar character.

The plaintiff requested the court to charge :—

2. That if the jury believe the evidence of R. H. Phelan, they may find from it that he had paid $100 in cash for the note when he bought the same, and that he bought it before maturity of one W. B. Goff, and that neither he nor Goff had notice of the circumstances under which the note was given, and there was nothing in the conduct of W. B. Goff which suggested to R. H. Phelan that the note had been obtained from the defendant unfairly; and if they so find the facts, the plaintiff is entitled to recover the amount of the note, even if the jury should believe the same was procured from the defendant by George W. Benton by fraud and false representations.

3. That the note in suit being payable to George W. Benton or bearer, and having before maturity been in the possession of W. B. Goff, against whom there is no evidence of notice of the original transaction, or of circumstances to put him upon inquiry, the law protects it in the hands of every subsequent holder for value, and the plaintiff is entitled to recover the amount of the same, notwithstanding all the facts relied upon as a defence in this case.

The court refused the points and charged :—

" If the defendant did not sign the note there is an end of the case, and the plaintiff cannot recover.   But if you find he did make the note, other questions arise.

" The uncontradicted evidence is that Moss received no consideration, but the whole was a fraud and swindle.   But it is

[Phelan v. Moss.]

strictly a commercial note—what is called negotiable paper, and came into possession of the plaintiff before it was payable and for valuable consideration, can the defendant resist the payment of the note in the hands of the plaintiff? We have allowed evidence to go to you which we think, if believed, should have put plaintiff upon inquiry; this inquiry strictly pursued would have let him into a knowledge of the fraudulent character of the note. There was no endorsement on the note. Goff the negotiator was a stranger. It was purchased by plaintiff for $100. The note was for $250, and the drawer known to be solvent. The stamps not properly cancelled, no initials of name upon them, and in fact no cancellation whatever. No evidence that the immediate holder before this sale, or any one before him, had paid valuable consideration for the note. If you find these are the facts, it is our opinion, and we so instruct you that the plaintiff cannot recover."

The verdict was for the defendant.

The plaintiff removed the case to the Supreme Court, and assigned for error the admission of the evidence and the refusal of his points.

*A. A. Purman*, for plaintiff in error.—The evidence did not show constructive notice to the plaintiff, and Goff's innocence would protect him: Story on Prom. Notes, § 197, and notes; Goodman v. Stephens, 4 Ad. & E. 870. The facts were not suspicious: Belmont State Bank v. Hoge, 6 Am. Law Reg. N. S. 230. In such case as this there is no question as to diligence, &c.: Raphael v. Bank of England, 33 Eng. Law & Eq. 276; Worcester Bank v. Dorcester Bank, 10 Cush. 488; Goodman v. Simonds, 20 How. 843; Bay v. Caddington, 5 Johns. 54; Ellicott v. Martin, 6 Md. 509; Matthews v. Poythress, 4 Ga. 287; Magee v. Badger, 30 Barb. 246. Goff's possession was primâ facie evidence that he was a holder for value: Snyder v. Riley, 6 Barr 168; Hutchinson v. Boggs & Kirk, 4 Casey 294; Milner v. Dawson, 5 Exch. 948. Having purchased in good faith, he had a right to sue: Allaire v. Hartshore, 1 N. J. 665; Chicopee Bank v. Chaquin, 8 Met. 40; Youngs v. Lee, 18 Barb. 187; Simpson v. Clark, 2 Cromp., M. & R. 342; Brown v. Mott, 7 Johns. 361; Edwards v. Jones, 7 Car. & P. 633. One who advances money bonâ fide in the purchase of negotiable paper, is a holder for value: Swift v. Tyson, 16 Peters 15; Bosanquet v. Dudmon, 1 Stark. R. 1; Ex parte Bloxham, 8 Ves. 531; Haywood v. Watson, 4 Bing. R. 496; Braman v. Roberts, 1 Bing. New Cases 469; Brush v. Scribner, 11 Conn. 388; 3 Kent's Com. 81; Beltzhoover v. Blackstock, 3 Watts 24; Besbing v. Graham, 2 Harris 14; Bullock v. Wilcox, 7 Watts 328; Harrisburg Bank v. Meyer, 6 S. & R. 537; Knight v. Pugh, 4 W. & S. 445. It

[Phelan *v.* Moss.]

is not a defence that there was no original consideration: Whittaker *v.* Edmonds, 1 Moody & R. 366; or the consideration was illegal: Morris *v.* Langley, 19 N. H. 423; or the note obtained by fraud or stolen: Power *v.* Ball, 27 Vt. 662. The same principle is in Lord *v.* Ocean Bank, 8 Harris 384; Callen *v.* Fawcett, 8 P. F. Smith 113; Story on Prom. Notes, § 191; Edwards on Bills and Notes 294; Haly *v.* Lane, 2 Atk. 182; Chalmers *v.* Lanior, 1 Cowp. R. 383; Robison *v.* Reynolds, 2 Ad. & E. N. S. 196.

*E. M. Sayers*, for defendant in error, cited 3 Kent's Com. 82; Snyder *v.* Riley, *supra;* Bay *v.* Coddington, 5 Johns. Ch. R. 56; Ayer *v.* Hutchins, 4 Mass. 370.

The opinion of the court was delivered, January 3d 1871, by

READ, J.—The law of bills of exchange owes much of its scientific and liberal character to the wisdom of the great jurist of his age, Lord Mansfield, who was sometimes in advance of his contemporaries in attempting to introduce equitable principles in suits at common law. What was then disapproved would now be approved; and Lord Penzance in the House of Lords supported the proposition, that when law and equity conflicted, the equitable principle should prevail.

Sixteen years before the American Revolution, Lord Mansfield held, in Miller *v.* Race, 1 Burrow 452, that bank notes, though stolen, became the property of the person to whom they are bonâ fide delivered for value, without knowledge of the larceny. Forty-three years afterwards, in Lawson *v.* Weston, 4 Esp. 56, Lord Kenyon held, that if a bill has been lost, and the loser has advertised it in the newspapers, and it is discounted for the person who found it, and so came fraudulently by it, this entitles the person discounting it to recover the amount, if done bonâ fide, and without notice of the way in which the holder became possessed of it. Lord Kenyon said: "I think the point in this case has been settled by the case of Miller *v.* Race, in Burrow. If there was any fraud in the transaction, or if a bonâ fide consideration had not been paid for the bill by the plaintiffs, to be sure they could not recover; but to adopt the principle of the defence to the full extent stated, would be at once to paralyze the circulation of all the paper in the country, and with it all its commerce."

The principle established by these decisions remained the undoubted law of England for sixty-six years, until Lord Chief Justice Abbott, in Gill *v.* Cubitt, 3 B. & C. 466, propounded the novel and dangerous doctrine, that although the holder had given full value for the bill, if he took it under circumstances which ought to have excited the suspicion of a prudent and care-

ful man, he could not recover. The Lord Chief Justice said, "for these reasons, notwithstanding the unfeigned reverence I feel for everything that fell from Lord Kenyon, by whom Lawson v. Weston was decided, I cannot think the view taken by that learned lord at that time was the correct one." This cautious ruling, although carped at and quarrelled with, remained the law for ten years, when the discredit of the Bank of England bills on the continent, and the complaints of the commercial community, brought the matter before the King's Bench—which had been remodelled—for consideration: Crook v. Jadis, 5 Barn. & Ad. 909; and Backhouse v. Harrison, Id. 1098, were followed by Goodman v. Harvey, 4 Ad. & E. 870, in which Lord Denman said, "we have shaken off the last remnant of the contrary doctrine. Where the bill has passed to the plaintiff without any proof of bad faith in him, there is no objection to his title."

In the ninth edition of Chitty on Bills, by Chitty and Hulme, published in 1848, it is said, "and the case of Goodman v. Harvey has since finally decided, that even *gross negligence* is not alone enough to destroy the title of a holder for value; but that a case of *mala fides* on the part of such holder must be made out in order to defeat his claim. So that the doctrine of Lord Tenterden is now completely exploded, and the old rule of law, 'that the holder of bills of exchange endorsed in blank, or other negotiable securities transferable by delivery, can give a title which he does not himself possess to a person taking them bonâ fide for value,' 'is again re-established in its fullest extent.'"

The same doctrine is repeated in the tenth edition by Russell and MacLachlan, of 1859, p. 179; and also in Byles on Bills, fifth American, from the ninth London, edition, with notes by my brother Sharswood, p. 280.

The rule therefore adopted by the English courts one hundred and twelve years ago, and which has stood the test of the practice and experience of the greatest commercial country of modern times, is now the undisputed and settled law of England.

In Brush v. Scribner, 11 Conn. 388, Chief Justice Williams, in 1836, in the course of a long and learned opinion, asserted the same doctrine, quoting Miller v. Race, Crook v. Jadis, and Backhouse v. Harrison, in support of it. In Worcester County Bank v. Dorchester and Milton Bank, 10 Cush. 488, in 1852, the Supreme Court of Massachusetts, quoting Goodman v. Harvey and kindred cases, held, that if he took the bill in good faith he is entitled to recover on it. "The burden of proving good faith is all the burden which the law imposes on him."

In Hall v. Wilson, 16 Barb. 548, in 1853, Judge Allen, citing Crook v. Jadis and the subsequent cases, says, "the doctrine of the cases last cited has been adopted and approved by the courts of some of the states of the Union, and I have met with no case

in our own courts in conflict with it." This case is recognised in Magee *v.* Badger, 30 Barb. 246.

In Swift *v.* Tyson, 16 Peters 1, it was held that a bonâ fide holder of a negotiable instrument for a valuable consideration, without any notice of the facts which impeach *its* validity as between the antecedent parties, if he takes under an endorsement made before the same becomes due, holds the title unaffected by these facts, and may recover thereon, although as between the antecedent parties, the transaction may be without any legal validity; and it was also held that the holder of negotiable paper before it is due is not bound to prove that he is a bonâ fide holder for a consideration, without notice; for the law will presume that, in the absence of all rebutting proof, and therefore it is incumbent on the defendant to establish, by way of defence, satisfactory proof of the contrary, and thus to overcome the primâ facic title of the plaintiff.

In Goodman *v.* Symonds, 20 How. 343, these principles were again affirmed, by the unanimous opinion of the Supreme Court of the United States recognising the decision of Goodman *v.* Harvey in its fullest extent.

This doctrine is approved in Story on Bills of Exchange, § 416; Edwards on Bills 506; 2 Parsons on Bills 277, 278, 279; and in the 6th edition of Story on Prom. Notes, 1868, § 382. The statements in Judge Story's works on bills of exchange and promissory notes, we know, by Swift *v.* Tyson, to have been his deliberately formed opinions.

There are no reported cases in Pennsylvania on bills of exchange and promissory notes prior to the Revolution, and but nine in 1 Dallas, twenty-one in the three other volumes, and fourteen in the four volumes of Yeates. In The Bank of North America *v.* McKnight, 2 Dallas 158, in 1792, Chief Justice Mc-Kean said, "before the Revolution it was not usual to give notice to the endorser as soon as a note became due.; it would have been considered as harsh and unreasonable. But since the establishment of the bank, a rule has been introduced; and as these notes lodged in the bank were often accommodation-notes, it was highly reasonable that notice should be given in a *short* time. What that time ought to be has not been determined. Two or three months would certainly be too long, and a day may be too short. I would not *singly* lay down a rule, but leave it to the jury as a question of fact." The notice given in this case was four or five days after the note became due, which was in 1786, and the verdict was for the plaintiff.

The seat of the general government, from 1790 to 1800, was in Philadelphia, and it speedily became a place of great commercial importance. In order to give promissory notes made in Philadelphia, in a particular form, their full commercial value,

[Phelan *v.* Moss.]

the Act of 27th February 1797, making them not liable to any plea of defalcation or set-off, was passed, which act was rendered useless by the decision of the Supreme Court, in 1838, in Bullock *v.* Wilcox, 7 Watts 328, restoring the universal commercial law to all promissory notes made in any part of the state.

I am aware that Judge Sergeant, in Beltzhoover *v.* Blackstock, 3 Watts 20, in September 1834, before the cases shaking Gill *v.* Cubitt were published in America, and a year and a half before it was overruled, used this language: "And I concur in the position that if an endorsee takes a note heedlessly, and under circumstances which ought to have excited the suspicions of a prudent and careful man, the maker or endorser may be let into his defence: Gill *v.* Cubitt, 3 B. & C. 466; 3 Kent's Com. 53." But the principle thus stated was not necessary to the decision of the case before the court, nor was it used by the learned judge, but he used expressions looking to the older doctrine, as "it would be hard to subject a man to the consequences of mala fides, when perhaps he never had knowledge of the matter alleged." The citation of 3 Kent's Com. 53 is from the first edition published in 1828, when Lord Tenterden's doctrine was apparently the law of England. In the 3d edition of 1836, p. 82, the text was left unaltered, but in a note, Backhouse *v.* Harrison, Crook *v.* Jadis, and 2 Myl. & K. 638 are cited, with the remark, "so that the case of Gill *v.* Cubitt seems to be somewhat weakened." In the 4th edition of 1840, p. 82, the same note is preserved, with the addition of Goodman *v.* Harvey. All these editions were edited by Chancellor Kent.

In the preface to the 9th edition of Chitty on Bills, published in 1849, the editors, Messrs. Chitty and Hulme, say: "Of the various decisions which have taken place on the bills of exchange, perhaps the most important are those which establish in contradiction to the doctrine laid down by Lord Tenterden, that the claim of a bonâ fide holder of a bill which has been lost or fraudulently obtained, is not to be defeated by his having taken it under *circumstances which ought to have excited the suspicion of a prudent man;* but that in order to destroy the holder's title, he must be shown to have taken the instrument mala fides. The rule thus established, not only relieves bills and notes from the clog, which a contrary doctrine is calculated to impose on their negotiability, but presents at once a clear and intelligible question for the consideration of a jury; while to leave it to a jury to determine as to the degree of caution which a prudent man must exercise on taking such an instrument, leads to much perplexity and frequent injustice."

In the eleventh edition of Kent's Commentaries by Judge Comstock, in 1866, vol. 3, p. 103–4, there is added to the note "so that the case of Gill *v.* Cubitt seems to be somewhat weak-

17 P. F. SMITH—5

[Phelan *v.* Moss.]

ened if not destroyed." "Mr. Justice Story (Story on Bills 216) considers the doctrine in Gill *v.* Cubitt as absolutely overruled and abandoned."

The case of Gill *v.* Cubitt was decided whilst Chancellor Kent was lecturing and writing his commentaries, and he took the doctrine of an eminent judge, Lord Tenterden, as a correct exposition of the English law, without any thorough examination, and without the aid of the subsequent decisions, restoring the rule of Lord Mansfield.

In McLaughlin *v.* Commonwealth, 4 Rawle 464 (21st February 1834), which was an indictment for stealing three promissory notes, commonly called bank notes, on the Bank of the United States, Judge Kennedy speaking of notes which had not been issued, or if issued had been paid in, being robbed or stolen from the bank said, "for I have no doubt but the bank would be liable to pay notes thus stolen from it, after they had come into the hands of bonâ fide holders, although they might have received them from the thief himself." "Being in negotiable form and for the payment of money, they are considered as part of the circulating medium of the country, and the man who is about to receive them in payment, in the ordinary course of his lawful business is no more bound to inquire how and by what means the holder came by the possession of them, and whether they were obtained from the bank by its consent or not, than he is bound to inquire of his debtor who offers to pay him in dollars coined at the mint of the United States, how he came by them and whether or not they were obtained lawfully from the mint."

Taken in connection with the case of Bullock *v.* Wilcox cited above, where it was held that "the bonâ fide holder for value and without notice of a negotiable note made to A. B. or bearer, is entitled to recover on it against the maker, free from all subsisting equities between the original parties, and particularly considering the language of the learned judge (Kennedy) in delivering the opinion of the court, there is little doubt of their approval of the old doctrine of Miller *v.* Race, and I can draw no other conclusion from the language used by Judge Rogers in Bisbing *v.* Graham, 2 Harris 14.

The law is clearly stated in 1 Smith's Leading Cases, vol. 1, part 2d, p. 749, 750, Am. ed. 1866, and at page 752 in the American note it is said, "in Dickson *et al. v.* Primrose *et al.*, 2 Miles 366, it is said that the plaintiff must prove he gave full consideration, 'and in some cases he must even show that he took it without any circumstances of suspicion or his ownership will not be held bonâ fide.' But in a later case that court adopted the principle of Backhouse *v.* Harrison, and decided that the defendant must prove fraud." The case in 2 Miles was decided on the 11th January 1840. It was upon a rule to show cause why judgment

[Phelan *v.* Moss.]

·should not be entered for want of a sufficient affidavit of defence, ·which disclosed a case in which as· between the original parties to the bill the drawee could not have recovered.  It is clear this would call on the holder to prove value, and this was a sufficient reason to refuse judgment.   The other case was that of a stolen note from a counting-house in Philadelphia, and sold by a stranger at Harrisburg to a respectable lawyer at a considerable discount, and I gained the cause by having in my possession the only copy of the ninth edition of Chitty on Bills in the city.  I believe this ruling has been uniformly followed by that court.

It has been held in several cases, and is undoubted law, that the endorsee in a suit by him against the maker of a promissory note, cannot be called on to prove consideration, until the defendant has shown it was obtained or put into circulation by fraud or undue means : Knight *v.* Pugh, 4 W. & S. 445 ; Brown *v.* Street, 6 Id. 221 ; Hutchinson *v.* Boggs & Kirk, 4 Casey 294 ; Gray's Adm'rs *v.* Bank of Kentucky, 5 Casey 365.

In the case before us the evidence clearly shows that the defendant, induced by the promise of being an agent to sell Benton's patent washing-machines, signed a note payable six months after date to George W. Benton, or bearer, for $250 dollars, for value received, with interest, without defalcation.   Township of Aleppo, dated June 10th 1868.   The young man to whom he gave it, is described as twenty or twenty-five years of age, had a two-horse buggy, with dark chestnut mares, and said he was agent for selling washing-machines of a man of the name of Benton.   The allegation of the defendant is that he signed a contract, but not the note.  But it is clear he signed the note, but under circumstances which would prevent a recovery between the original parties.

Assuming that it was a fraud, then the question recurs, was the plaintiff a bonâ fide holder for value, without notice of the fraud.   It was purchased by him on the 16th November 1868, from a man who said his name was W. B. Goff, who gave him a receipt showing the amount paid him for the note.   He gave him $100 in cash for the note.  "He told me he did not know what the note was given for; said he had got it in New York on trade. The man was fifty or fifty-five years of age.   He said he resided in the state of New York."   There is no evidence that the plaintiff had any notice of the fraud, nor that Goff had, nor, according to the defendant's story, had he any notice or knowledge of it at that time.

The cause was tried by the learned judge upon a misconception of the law, as appears by his answers to the 2d and 3d points, and by his charge to the jury.

The learned judge said, " We have allowed evidence to go to you, which we think, if believed, should have put the plaintiff ·upon inquiry.   This inquiry strictly pursued would have let him

[Phelan *v.* Moss.]

into a knowledge of the fraudulent character of the note." This could not have been ascertained except by going to the maker himself. This is not the law, nor are the subsequent objections. "There was no endorsement on the note." It was payable to bearer, and the holder gave a receipt for the amount paid. "Goff, the negotiator, was a stranger;" this is no objection. "It was purchased by plaintiff for $100, the note was for $250 and the drawer known to be solvent," nor is this; nor that in cancelling the stamp the initials were omitted. The most extraordinary, however, is the objection that no "evidence that the immediate holder before this sale, or any one before him, had paid valuable consideration for the note," a doctrine that would put an end to all negotiable paper. Neither one nor all these facts, if found by the jury, proved mala fides on the part of the holder, or brought home to him knowledge of the fraud; but, on the contrary, it was clear that he was a bonâ fide holder for value without notice, and of course entitled to recover.

The court were, therefore, wrong in instructing the jury that the plaintiff could not recover.

Judgment reversed, and *venire de novo* awarded.