Hanley v. Epstein et al., Appellants.

508

Argued November 2, 1932.

Before Trexler, P. J., Keller, Gawthrop, Cunningham, Baldrige, Stadtfeld and Parker, JJ.

*George T. Steeley,* for appellant.—Where a negotiable instrument, payable to order is endorsed by the payee in blank, such endorsement purports property in the holder, and the transferee may treat him as a bona fide holder without making inquiries as to how he received or held it: Denton National Bank v. Kenney, 81 Atl. 227; Johnson County Savings Bank v. Koch, 38 Superior Ct. 553; Phelan v. Moss, 67 Pa. 59; Moorehead v. Gilmore, 77 Pa. 118.

*D. P. Hibberd,* and with him *Vaughn & Gaul,* for appellee, cited: Fehr v. Campbell, 288 Pa. 549; Norristown-Penn Trust Co. v. Middleton et al., 300 Pa. 522.

Opinion by Baldrige, J., January 25, 1933:

On May 26, 1931, Marie G. Hanley delivered a check drawn on the North Broad National Bank of Philadelphia, payable to the order of Thomas J. Hanley, her husband, in the sum of $240.40. On the same date, the payee endorsed the check, put it in an envelope, and

mailed it to "Mr. Sullivan", a paying teller in the First Camden National Bank, 223 Market Street, Philadelphia, for deposit. When the plaintiff received a settlement sheet from the deposit bank, he learned that the check had not been credited to his account, and, upon inquiry, found it had been cashed on May 27, 1931, and bore on the reverse side the following endorsements: "Thomas J. Hanley", "E. Sullivan", "Al's Money Loan Office," "Prior Endorsements guaranteed Commercial Nat'l Bank & Trust Co., Philadelphia, Pa. Wm. Dowling Vice-Pres.—Asst. Cashier."

Simon Epstein, a member of the copartnership of Al's Money Loan Office, testified that on the morning of May 27, 1931, a well-dressed man, who gave his name as "E. Sullivan", came to defendant's place of business to purchase a diamond ring for the sum of $90, and produced the check in question; that he took the check and gave a receipt which set forth that if the check was found satisfactory Sullivan was to receive the cash difference of $150.40 and the diamond ring. Epstein was unacquainted with the possessor of the check, who endeavored to identify himself by producing a pass card of the Elks Lodge in Pittsburgh, bearing the name of "E. Sullivan", and stated that his residence was 604 Liberty Street, Pittsburgh. When Epstein exhibited the check at his bank, Mr. Dowling advised him that if he was unacquainted with Sullivan, he would not accept the check, to which Epstein replied: "Oh, well, he was a customer and I could make a sale." Dowling called the bank upon which the check was drawn, received a satisfactory report, and, upon Epstein's endorsing the check, guaranteed the endorsement. Epstein then took the check to the North Broad National Bank, at 5900 North Broad Street, received the cash, and completed the transaction by delivering the ring and giving the purchaser $150.40 in

cash. Epstein, in explaining his going in the neighborhood of sixty city blocks and personally cashing the check, said that it was his habit, when he received a check from an unknown customer, to present it at the bank upon which it was drawn, because he had had a couple of previous forgery cases. Hanley testified that at a conference held between Epstein, Dowling and him, when it was discovered the check had been cashed, Epstein said he would pay the check but desired first to consult counsel. Payment was not made, and suit was brought.

The plaintiff, in his statement of claim, alleged that the check had been stolen; that the defendants were not holders in due course as Simon Epstein was a party to this fraudulent transaction. The jury was properly instructed that if they believed the title of "E. Sullivan" was defective, then the burden of proof was on defendants to show they were holders in due course. Under section 52, ch. I, art. IV, of the Act of May 16, 1901, P. L. 194 (56 PS §132), Epstein, if a holder in due course, must have taken the instrument in good faith and for value, without notice of any infirmity or defect in the title; section 55 (56 PS §135) provides that the "title of a person who negotiates an instrument is defective, within the meaning of this act, when he......negotiates it in breach of faith or under such circumstances as amount to a fraud;" section 56 (56 PS §136) provides: "To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

True, there was no direct testimony that the check had been stolen, or in what circumstances it came into the possession of "E. Sullivan;" but the jury, under the testimony, could have concluded that it had been

stolen, and that Epstein, the possessor of the stolen property in less than 24 hours after the alleged theft, was a party to the illegal transaction. There is no testimony that any other person than he saw "E. Sullivan." The jury may have disregarded Epstein's story of Sullivan's presenting the check, and concluded that he was a mythical person, given a name suitable to consummate the fraud. The defendants are not now in position to say that there was no evidence of a theft of the check, as they expressly recognized that the jury should determine whether the check was stolen, and if so, whether Epstein was the guilty party. In two of their written points, they asked the trial judge to say to the jury: Point 5. "If you find that the theft of said check was due to the carelessness of the plaintiff by endorsing said check in blank,......your verdict should be for the defendants;" Point 6. "If you find under all the evidence that the said check was stolen by some one, but that the defendants did not steal the check, but received it from the thief or someone else, in the usual course of their business......your verdict should be for the defendants." Both of these points were affirmed.

Of course, if the check was stolen by Epstein, he was not a holder in due course, and the plaintiff is entitled to recover. If the check was stolen by a person other than Epstein, the jury could have properly concluded that his refraining from making further inquiry as to the identification of "E. Sullivan" was due to his fear that it would disclose a defect in his title. In Norristown-Penn Trust Co. v. Middleton et al., 300 Pa. 522, 530, 150 A. 885, the court said: " 'Where the circumstances are such as to justify the conclusion that the failure to make inquiry arose from a suspicion that inquiry would disclose a view or defect in the instrument or transaction, such endorsee is charged with knowledge': 8 C. J. 505. The facts and circumstances may

be so suspicious as to be evidence of bad faith sufficient to take the question to the jury: 8 C. J. 501." We concede that ordinarily the mere taking of a check under suspicious circumstances is not sufficient to invalidate it in the hands of the holder, unless there is proof of such fact from which bad faith may be reasonably inferred: The Lancaster Co. Nat. Bank v. Garber, 178 Pa. 91, 35 A. 848. In 8 C. J. 505, it is stated: "As to when the known facts are such as to require inquiry, in order to escape being a holder in bad faith, no precise rule can be laid down......, but it will be found that each case must depend for the most part on its own particular circumstances; and while, as hereinafter stated, certain facts are not of themselves sufficient to show bad faith in not making inquiry, yet it often happens that evidence thereof is admissible, and, together with evidence of other suspicious circumstances, sufficient to require the submission of the question of bad faith to the jury."

In view of all the attending circumstances in this case, we are of the opinion that there was enough affirmative evidence for the jury to determine whether the defendants had such knowledge as to constitute this a dishonest transaction, or whether they became holders of the check in due course.

Nor do we think that the appellants are in position to complain of the failure of the trial judge to comply with the request of counsel, who, after the charge, orally requested him "to charge the jury regarding suspicion," to which the judge made an answer: "I will not make any addition to my charge." That reply would have been improper if a suitable request for further instructions had been made. The request was entirely too indefinite. If counsel desired more specific instructions, he should have been more explicit in his request.

Judgment is affirmed.