**BANKERS TRUST COMPANY OF WESTERN NEW YORK**

v.

**Stuart CRAWFORD, Kutner Buick, Inc., Chalfont Industries, Inc.**

**Appeal of Stuart CRAWFORD, Appellant.**

**No. 85–1090.**

United States Court of Appeals, Third Circuit.

Argued Nov. 6, 1985.

Decided Jan. 13, 1986.

Alfred W. Putnam, Jr. (Argued), Fred Greenberg, Drinker Biddle & Reath, Philadelphia, Pa., for appellant.

Wilbur Greenberg (Argued), Segal, Wolf, Berk & Gaines, Philadelphia, Pa., for appellee.

Before SEITZ, WEIS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This case involves conflicting claims to a cashier's check drawn by Stuart Crawford on the Bankers Trust Company of Western New York (the Bank). Crawford mailed the check to Chalfont Industries, Inc. (Chalfont) as payment on a distributorship agreement he had entered into with Chalfont. Chalfont endorsed the check to Kutner Buick, which sought payment as a holder in due course. Kutner Buick was unable to collect on the check, however, because Crawford had obtained an order from a New York Supreme Court restraining payment of it.

To resolve the conflicting claims, the Bank filed suit in the United States District Court for the Western District of New York, paid the amount of the check into the court, and interpleaded Chalfont, Crawford, and Kutner Buick. The case was transferred to the Eastern District of Pennsylvania[1] where Crawford argued that Kutner Buick was not a holder in due course because its president was the father of Chalfont's president and the two companies maintained a close financial relationship. The court, 600 F.Supp. 843, held that Kutner Buick was a holder in due course and entitled to the proceeds of the check. Crawford appeals and we affirm.

### I.

The facts in this case are not generally in dispute. Chalfont Industries was a manu-

---

1. The district court had jurisdiction under 28 U.S.C. § 1335 (federal interpleader) and 28 U.S.C. § 1397. Diversity exists because Crawford is a New York citizen and Kutner Buick is a corporation organized under the laws of and has its principal place of business in Pennsylvania. Jurisdiction is proper in this court pursuant to 28 U.S.C. § 1291 (final judgments of district courts).

facturer of an automotive product, "Stop-A-Flat." From December 1981 to February 1982 Crawford negotiated with Chalfont concerning his possible purchase of a distributorship for North Carolina. During the negotiations, Chalfont made a number of false representations to Crawford relating to the product and the distributorship. Chalfont further promised Crawford that his distributorship would be at "no risk" because Chalfont would buy back any product that Crawford purchased from Chalfont but could not sell. Chalfont drafted an agreement without a clear buy-back provision, but Crawford's lawyer redrafted the agreement to accurately reflect the provision. At the signing on February 10, 1982, a Chalfont employee left the room with Crawford's redrafted agreement, ostensibly to obtain the president's signature. He returned with a document, open to the signature page and signed by Chalfont's president. This document, however, was not the agreement Crawford had brought, but a substituted one, which did not contain the buy-back provision. Crawford signed the agreement without realizing that a substitution had been made by Chalfont.

As payment on the agreement, Crawford wrote a personal check for $42,023 and one for $5,000. Chalfont endorsed these checks and delivered them to Kutner Buick which deposited them. On that same day, February 10, 1982, Kutner Buick issued a number of checks to Chalfont totaling $47,056 which Chalfont endorsed over to various companies, apparently some of its creditors. Crawford successfully stopped payment on the $42,023 check on February 14, but was unsuccessful in efforts to stop payment on the $5,000 check. At that point, Kutner Buick was out-of-pocket $42,056 as a result of Crawford's stop-payment order.

A week later, after further discussions with Chalfont's president, Jerome Kutner, Crawford instructed his son in New York to request the Bank to issue a cashier's check in the amount of $50,023 payable to Chalfont Industries. Crawford's son did so and mailed the check to Chalfont. After his son mailed the check, Crawford again

had misgivings about Chalfont; Chalfont's national sales manager called and warned Crawford to stop payment on his check. Crawford instructed his lawyer to try to stop payment, and he himself proceeded to Chalfont's office in Pennsylvania to physically intercept the check. On Crawford's arrival at the Chalfont office on Monday, February 22, 1982, a Chalfont employee told him that he could have the check when it arrived. Crawford waited in Chalfont's offices for two days, but was told the check had not arrived. In fact, the check had been received and Chalfont had endorsed and delivered it to Kutner Buick. Except for $8,000 which it returned to Chalfont, Kutner Buick applied the proceeds of the check to the amount due it as a result of the stop-payment on the February 10, 1982, check for $42,023.

Crawford's lawyer in the meantime had obtained an order from the Supreme Court of New York, blocking payment on the check. The Bank filed an interpleader naming Crawford, Kutner Buick, and Chalfont as defendants. The case was transferred to the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1404 (change of venue). The court conducted a bench trial; only Crawford and Kutner Buick asserted claims to the check. Kutner Buick argued that it was "a holder in due course" and thus entitled to the check without regard to Chalfont's fraudulent conduct. Crawford responded that Kutner Buick should not qualify as a holder in due course because of its close relationship with Chalfont Industries.

The record indicates that Chalfont Industries and Kutner Buick indeed maintained a close relationship. Kutner Buick is wholly owned by Jules Kutner and Chalfont Industries is wholly owned by his son, Jerome. Jules provided the initial capital for Jerome to establish Chalfont Industries, lent him funds for working capital, and made further capital infusions. At one time, Jules obtained a loan from Kutner Buick for Chalfont and repaid it without Chalfont ever having issued a note as evidence of the debt. Jules ultimately obtained judg-

ments aggregating $315,000 against Chalfont based on loans Kutner Buick had made to it from time to time at well below prime interest rates.

Chalfont turned to Kutner Buick for other banking services as well. Kutner Buick regularly cashed Chalfont checks and established a system of writing Kutner checks in "exchange" for Chalfont checks. Other check exchanges took place, some with no discernible purpose. On one occasion, Chalfont used a Kutner Buick "exchange" check in part to meet its payroll. At least twelve checks from Chalfont to Kutner were returned due to insufficient funds. Finally, when Chalfont filed a petition in bankruptcy on March 4, 1982, Jules Kutner paid the filing fee.

After considering the evidence of the relationship between Chalfont and Kutner Buick, the district court made findings. It found that no evidence showed that Kutner Buick lacked good faith in accepting the disputed check, that Kutner Buick had no knowledge of any conversations between Crawford and employees of Chalfont, that Kutner Buick's failure to inquire regarding the cashier's check did not stem from an attempt to avoid knowledge of Crawford's efforts to stop the check, and that Kutner Buick had no knowledge of the circumstances surrounding the signing of the distributorship agreement. The court held

2. Crawford also argued that even if Kutner Buick is deemed to be a "holder in due course," its claim was barred because of illegality under Pennsylvania law underlying the distribution agreement, namely that as a franchise agreement it failed to comply with Federal Trade Commission regulations. 16 C.F.R. § 436.1 (1985). The district court rejected this argument as having no merit under Pennsylvania law and so do we. *Fitzpatrick v. Shay,* 314 Pa.Super. 450, 458–59, 461 A.2d 243, 247–48 (1983); *Shafer v. A.I.T.S., Inc.,* 285 Pa.Super. 490, 494, 428 A.2d 152, 154 (1981).

3. The parties have assumed that Pennsylvania law governs and have not briefed the issue. Our research discloses that after a change in venue upon a defendant's motion under section 1404(a), the transferee court should apply the conflicts rule that the transferor would have applied. *Glick v. Ballentine Produce, Inc.,* 343 F.2d 839, 843 (8th Cir.), *cert. denied,* 382 U.S. 891, 86 S.Ct. 184, 15 L.Ed.2d 149 (1965). *See Van Dusen v. Barrack,* 376 U.S. 612, 639, 84

that Kutner Buick was a holder in due course and entered judgment in favor of Jules Kutner, President of Kutner Buick.

### II.

Crawford raises two primary issues on appeal.[2] First, he argues that the district court erred in refusing to apply the "close-connection" doctrine to defeat Kutner Buick's claim to "holder in due course" status. Second, he argues that Kutner Buick was under a "duty to inquire" into the transactional circumstances surrounding the receipt of the check and, because it failed to do so, did not take the check in good faith. In this diversity case, we exercise independent review of the district court's application of state law to the facts, and of its disposition of mixed questions of fact and law. *William B. Tanner, Inc. v. WIOO, Inc.,* 528 F.2d 262, 266 (3d Cir. 1975). We now consider Crawford's contentions.

### A.

In Pennsylvania,[3] a holder in due course is a person "who takes the instrument: (1) for value; (2) in good faith; and (3) without notice that it is overdue or has been dishonored or of any defense or claim to it on the part of any person." 13 Pa.Cons.Stat.Ann. § 3302 (Purdon 1984). A holder in due

S.Ct. 805, 821, 11 L.Ed.2d 945 (1964) ("A change of venue under § 1404(a) generally should be, with respect to state law, but a change of courtrooms."). In this case, this required the district court in Pennsylvania to follow New York choice-of-law rules.

A New York court last addressed a choice-of-law case involving a holder in due course in 1938. In *Weissman v. Banque de Bruxelles,* 254 N.Y. 488, 173 N.E. 835 (1930), the Court of Appeals of New York held that the law of the state of transfer governs the transfer of a check or bill of exchange. *Id.* 254 N.Y. at 494, 173 N.E. at 837. Although conflicts of law jurisprudence has undergone significant change since 1938, *Weissman* is still good law and the Restatement (Second) of Conflicts § 216 (1971) agrees with it. Because in the instant case Chalfont transferred the cashier's check in Pennsylvania. Pennsylvania law determines the legal effect of the transfer of the check to Kutner Buick, the transferee.

course takes an instrument free of all defenses except for fraud in factum and such illegality as would render the obligation of the party a nullity. *See* Pa.Consol.Stat. Ann. tit. 13 § 3305 (Purdon 1984). Therefore, if Kutner Buick was a holder in due course, it is not subject to defenses arising from the underlying transaction, and properly received the check proceeds regardless of any defenses Crawford has against Chalfont.

■ Crawford argues that Kutner Buick was not a holder in due course because, under the "close connection" doctrine, it did not take the instrument in good faith. The close-connection doctrine, as stated by the Supreme Court of Ohio, provides that:

> A transferee does not take an instrument in good faith when the transferee is so closely connected with the transferor that the transferee may be charged with knowledge of an infirmity in the underlying transaction.

*Arcanum National Bank v. Hessler,* 69 Ohio St.2d 549, 554, 433 N.E.2d 204, 209 (1982). The district court refused to apply the close connection doctrine, holding that the doctrine is not the law in Pennsylvania because no Pennsylvania court has addressed it. Crawford argues that the Pennsylvania Supreme Court, if presented with the opportunity, would adopt the doctrine. *See Connecticut Life Ins. Co. v. Wyman,* 718 F.2d 63, 66 (3d Cir.1983) (when a precise issue has not been adjudicated by any state appellate court, the federal court's task is to predict how the state's highest court would decide the issue). Crawford, however, is unable to present a persuasive argument that Pennsylvania would resort to the doctrine. He asserts that the doctrine is "well-established," yet he can cite only six states that have adopted it (Colorado, Florida, Kansas, Mississippi, Ohio, South Dakota). Crawford also relies on the strength of the policy behind the doctrine—refusing holder in due course protection to purchasers who are not innocent. The doctrine

was developed in part because of the difficulty of proving the transferree's actual knowledge of problems in the underlying transaction. The doctrine allows the court to imply knowledge by the transferee when the relationship between the transferee and transferor is sufficiently close to warrant such an implication.

*Arcanum,* 69 Ohio St.2d at 557, 433 N.E.2d at 211. The desirability of solving such proof problems is undeniable, but Pennsylvania attempts to do so in another manner. It follows the rule that a duty to inquire may arise when circumstantial evidence shows that the holder did not exercise good faith.[4] That six scattered states have adopted the close-connection doctrine does not suggest that Pennsylvania would adopt it. The district court's holding that the close-connection doctrine does not apply in Pennsylvania is not erroneous.

**B.**

Crawford further argues, as he did in the trial court, that Kutner Buick was not a holder in due course because it did not take the check in good faith. In order to have taken in good faith, Crawford maintains, Kutner Buick had a duty to inquire into the circumstances surrounding transfer of the check. The district court held that the proper test for determining good faith is to ascertain whether the transferee exhibited willful dishonesty or actual knowledge, and that the evidence did not demonstrate that Kutner Buick was guilty of either.

The appellant's unequivocal position on appeal is that "Pennsylvania recognizes an affirmative duty to inquire on the part of a transferee where, as here, the transferee has reason to know that the transferor might be dealing in less than [a] correct manner." He asserts that Pennsylvania courts have consistently held that the good faith requirement which the law imposes on a holder in due course demands that he make an inquiry when he takes an instru-

---

**4.** Crawford acknowledges that the duty to inquire requirement is, in a sense, "one of the

reasons Pennsylvania has not heretofore needed to address the 'close-connection' doctrine."

ment under circumstances that suggest the existence of a defect or defense thereto.

We have examined the cases cited by Crawford in support of his representations, but we cannot agree that they support his proposition that the holder here had a duty to inquire. Prior to the adoption of the Uniform Negotiable Instruments Law (NIL), some courts held the view that

> one taking a negotiable instrument is put upon inquiry by circumstances calculated to arouse the suspicions of a prudent man, and if he has actual notice of circumstances sufficient to put a prudent man on inquiry as to a particular fact and he omits to make inquiry with reasonable diligence, he is deemed to have constructive notice of the fact itself, and he cannot be a taker in good faith.

11 Am.Jur.2d § 431, p. 461 (1963). Pennsylvania was not one of the states that subscribed to this point of view even before the NIL. As early as 1870, the Supreme Court of Pennsylvania held that the taking of a negotiable note under circumstances that suggest fraud is not a defense to liability on the note. *Phelan v. Moss*, 67 Pa. 59, 65 (1870). The holder of a note, for value, without notice, can recover it, "notwithstanding he took it under circumstances which ought to excite the suspicion of a prudent man." *Second National Bank of Clarion v. Morgan*, 165 Pa. 199, 30 A. 957, 958 (1895).

The duty to inquire is not an independent rule of law but is directly related to the question whether a holder of a negotiable instrument is acting in good faith. The mere taking of a check under suspicious circumstances is not sufficient to invalidate it in the hands of the holder, "unless there is proof of such fact from which bad faith may be reasonably inferred." *Hanley v. Epstein*, 107 Pa.Super. 507, 164 A. 122, 123 (1933). Good faith, in contrast with bad faith, is defined by the Uniform Commercial Code as "honesty in fact in the conduct or transaction concerned." 13 Pa. Cons.Stat.Ann. § 1201 (Purdon 1984). The Pennsylvania Supreme Court stated that this requires that one act "fairly and hon-

estly in acquiring the instrument and in regard to the right of all prior parties" and "is closely analogous to the equitable doctrine of unclean hands." *Fehr v. Campbell*, 288 Pa. 549, 558, 137 A. 113, 116 (1927).

Bad faith may be established by circumstantial evidence and each case must depend upon its peculiar facts. Therefore, in *In re Stroudsburg Security Trust Co.*, 145 Pa.Super. 44, 20 A.2d 890 (1941), cited by Crawford, the appellate court held that the bank there did not meet its burden of proving that it was a bona fide holder because it accepted corporate bonds from corporation's treasurer as a pledge for his personal debt without inquiry. The bank, therefore, had actual notice in the bonds themselves that the bonds were not owned by the treasurer and this imposed a duty to inquire. *Id.* at 50, 20 A.2d at 893.

*Hanley v. Epstein, supra*, also cited by Crawford, concerned a stolen check. The *Hanley* court ruled that sufficient suspicious circumstances surrounded the transfer of the check to enable the jury to properly conclude that the holder refrained from making further inquiry as to the identification of an indorsee "due to his fear that it would disclose a defect in his title." *Hanley*, 107 Pa.Super. at 511, 164 A. at 123. In this case, however, the district court made three insurmountable findings of fact that are supported by the record and are not clearly erroneous.

21. There is no evidence that Jules Kutner or any employee of Kutner Buick knew or had reason to know of Crawford's attempt to stop or reclaim the cashier's check.

22. There is no evidence that Jules Kutner or any employee of Kutner Buick knew or had reason to know of the occurrence or substance of any conversations between Crawford and employees of Chalfont.

23. There is no evidence that the failure of Jules Kutner or any employee of Kutner Buick to make any inquiries about the cashier's check stemmed from any

desire to evade knowledge of Crawford's efforts to stop the check.

These findings contrast sharply with the facts of *Norman v. World Wide Distributors, Inc.*, 202 Pa.Super. 53, 195 A.2d 115 (1963), also cited by appellant. In *Norman*, the appellate court found that the transferee of the note had been previously purchasing similar notes from the seller and its suspicions had been aroused sufficiently concerning the honesty of the underlying transaction as to prompt a call to the maker of the note in question "whether they were satisfied with the transaction." Moreover, the court concluded that the frequency with which the transferors changed their operating name—three times in one year—and the sale of the note made payable three days after the date of its execution to the transferee at a substantial discount were circumstances that imposed a duty upon the transferee of the note to have inquired further into the sales operation of the seller of the notes. Thus, in *Norman*, there were circumstances in the negotiation of the note itself, as well as other strong circumstances, suggesting irregularities in the underlying transaction for the note.

Thus, it appears from an analysis of the foregoing cases that Pennsylvania consistently follows the common law rule adopted by the Uniform Negotiable Instruments Law and the Uniform Commercial Code that there is no affirmative duty of inquiry on the part of one taking a negotiable instrument, and there is no constructive notice from the circumstances of the transaction, unless the circumstances are so strong that if ignored they will be deemed to establish bad faith on the part of the transferee.

The close relationship between the father and son, the unusual financial transactions between Kutner Buick and Chalfont, the extensive loans and guarantees of the father personally and of Kutner Buick and the advance of the bankruptcy filing fee, may raise questions as to how much Kutner Buick knew of the frauds practiced by Chalfont. The district court, however, found no evidence from the circumstances of the negotiation of the Crawford cashiers check or from the face of the instrument as would impose an affirmative duty on Kutner Buick to inquire into the underlying transaction. Kutner Buick apparently received the cashier's check in substitution for the check of February 10 on which Crawford had stopped payment. We have carefully reviewed the record and we can find nothing in the circumstances pertaining to the actual negotiation of the Crawford check or from the face of the check to put Kutner Buick on notice of any infirmity in the underlying transaction to suggest an affirmative duty of inquiry by Kutner Buick.

### III.

Although the detestable fraud practiced upon Crawford by Chalfont commands a searching inquiry into the validity of the negotiation of the check, we are confronted by very broad principles of public policy that support the circulation and credit of negotiable instruments. We are constrained to conclude that under Pennsylvania law Kutner Buick accepted the cashier's check as a holder in due course.

The judgment of the district court will be affirmed.

SEITZ, Circuit Judge, concurring.

I join in the prophecy of the majority that the Pennsylvania Supreme Court would not adopt the close-connection doctrine.

I join with the majority in affirming the conclusion of the district court that Kutner Buick accepted the cashier's check as a holder in due course. I write separately to emphasize that I so conclude only because, as an appellate judge, I am constrained to agree that the district court's factual findings are not clearly erroneous within the meaning of F.R.Civ.P. 52(a).