The CHASE MANHATTAN BANK, N.A.

v.

John J. COLEMAN, d.b.a.
Coleman Tire Sales.

82–443–Appeal.

Supreme Court of Rhode Island.

Aug. 6, 1985.

Jason D. Monzack (Halpert & Scoliard), Providence, for plaintiff.

Michael F. Horan, Pawtucket, for defendant.

---

## OPINION .

KELLEHER, Justice.

This appeal concerns the Uniform Commercial Code. One issue relates to the term "conspicuous," and the other deals with the extent of an assignee's right to enforce a "waiver of defense" clause embodied within an equipment lease entered into by the defendant in March 1976. The assignee in question is the plaintiff, Chase Manhattan Bank, N.A. The defendant is John J. Coleman, the owner of a Pawtucket business enterprise called Coleman Tire Sales. Hereafter we shall refer to the litigants as "Chase" and "Coleman."

Chase and Coleman came in contact with each other as a result of an "Exclusive Dealership, Trademark and License Agreement" entered into on March 8, 1976, by Coleman and Scotti Muffler Centers, Inc. (Scotti Muffler). This agreement gave Coleman an exclusive dealership for the sale and installation of Scotti Muffler products within the cities of Pawtucket and Central Falls. Those products included automotive mufflers, exhaust pipes, and shock absorbers. Scotti Muffler was a wholly owned subsidiary of Scotti Commercial Corporation (Scotti). A week later, on March 15, 1976, Coleman entered into an equipment lease with Commercial Resources Co. (Commercial Resources), a division of Scotti. The lease concerned the use of a "Scotti Bend-O-Matic Pipe Bending Machine," a device that bends straight exhaust pipes to fit the undercarriage of the automobile whose exhaust system is being repaired.

The lease called for monthly rental payments of $367.24, with an advance payment of $1,836.20 being paid at the time of the lease's execution. A portion of the advance payment was applied to the first month's rent, with the balance being used to pay the rent due for the last four months of the lease. Later, in May of 1976, Commercial Resources assigned its interest in the lease to Chase.[1] Coleman then made sixteen monthly payments to Chase, the last payment being received by Chase in late September 1977. When Coleman learned that Scotti Muffler was involved in insolvency proceedings, he stopped making any further monthly payments because he believed he would encounter difficulty with his clientele in honoring Scotti's "lifelong guarantee." After Chase's efforts to secure further payment from Coleman proved unsuccessful, this litigation ensued.

Hereafter, in referring to the assignor, we will eschew any reference to a corporate division or a corporate subsidiary and refer to the assignor as "Scotti."

The provisions of the equipment lease are set forth on one sheet of printed paper. The lease consists of fifteen separate clauses, each of which is preceded by a word or phrase set forth in bold type that summarizes the contents of the following paragraph. Two of the fifteen clauses appear on the face of the lease, and the remaining thirteen are set forth on the document's back page. The print on the lease's back page is slightly smaller than the print appearing in the clauses on the face of the instrument, one of which relates to "term and rental notices," while the other speaks of "title." Also on the face of the lease, above the line where Coleman's signature appears, can be found two admonitions, both in bold-face large type. The first cautions the reader or signer to "see reverse side of this form for the additional terms of this lease," and the second states, "By execution hereof, the signer hereby certifies that he has read this Agreement *including the reverse side hereof,* and that he is duly authorized to execute this lease on behalf of Lessee." (Emphasis in original.)

The clause at issue before us is found near the bottom of the reverse side of the lease document. It is clause 12, entitled "Assignment," and it provides, in pertinent part:

---

1. Chase paid Commercial Resources $15,148.65 for the right to collect from Coleman $367.24 per month for fifty-five months, for a total return of $20,198.28.

"This lease, the equipment and any rental and other sums due or to become due hereunder, or any part of the foregoing, may be transferred or assigned by Lessor without notice, * * * the obligations of Lessee hereunder shall not be subject, as against any such transferee or assignee, to any defense, setoff or counterclaim available to * * * Lessee against Lessor and that the same may be asserted only against Lessor. * * * "

In a bench decision given sometime after counsel for both litigants had submitted memoranda, the trial justice indicated that one issue was whether or not Coleman had been given "adequate notice" by Scotti of its assignment to Chase. He faulted paragraph 12, dealing with Scotti's right of assignment, because, in his opinion, this clause was not "conspicuous." In discussing Coleman's claim that the assignment clause was inconspicuous, the trial justice quoted from a portion of the Code, specifically, G.L.1956 (1969 Reenactment) § 6A–1–201, entitled "General Definitions," and which sets forth forty-six different words or phrases and defines each of them, with the caveat that the definition may change depending upon the context in which it appears. Section 6A–1–201(10) states that "[a] term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it."

█ There are several provisions of the Code in which a requirement for conspicuousness is specifically set forth. For example, § 6A–2–316(2) provides that any modification of an implied warranty of fitness "must be by a writing and conspicuous." Also, § 6A–8–204 directs that a restriction on transfer of stock imposed by an issuer will be ineffective unless "noted conspicuously on the security." However, an examination of § 6A–9–206 and its approval of agreements by an obligor not to assert defenses against an assignee reveals no mandate that the terms of such an agreement be conspicuous. Thus, the trial justice erred when he relied upon the definition set forth in § 6A–1–201(10).

The assignment provision found in clause 12 falls within the relevant terms of § 9–206(1) of the Uniform Commercial Code,[2] which confers (as does G.L.1956 (1969 Reenactment) § 6A–9–206(1)) upon an assignee the status of a holder in due course, provided the assignee takes the assignment "for value, in good faith and without notice of a claim or defense, except as to defenses of a type which may be asserted against a holder in due course of a negotiable instrument under the chapter on commercial paper * * * ."

█ After rejecting Chase's claim on the "conspicuous" question, the trial justice went on to characterize the financial dealings between Chase and Scotti as "a classic example of high financing, high business financing" but failed to provide any clear rationale to support his second conclusion that Chase could not prevail because it had not acquired the status of a holder in due course. Apparently, he presumed that since Scotti had granted Coleman, in the

---

**2.** The Uniform Commercial Code is promulgated by a Permanent Editorial Board under the joint auspices of the American Law Institute and the National Conference of Commissioners on Uniform State Laws. In 1962, § 9–206(1) was amended by adding references to leases and parties to a lease. The board believed that § 9–206 should be made applicable to leases as well as more traditional purchase money security interests because of the "substantial growth in lease financing and the quiet parallel application of problems dealt with by this section to both conditional sale contracts and leases." With few exceptions, most states have adopted the 1962 amendment. Rhode Island is one of the exceptions. 4 Anderson, *Uniform Commercial Code*, § 9–206 at 197–99 (2d ed. 1971). Throughout the course of this litigation, however, the parties have not addressed this point, perhaps believing that the equipment lease was intended to create a security interest. *See* § 6A–9–102(1)(a). Another inference is that the litigants agreed to be bound by a term within the lease that states that the lease would be governed by the laws of New York. At this juncture we will hold the litigants to their choice and suggest that the Legislature amend § 6A–9–206(1) to conform with the provisions of the Uniform Commercial Code's § 9–206(1).

trial justice's words, a "life agreement to use this particular machine" and that "subsequent to the assignment" Scotti went into bankruptcy, Chase had actual or constructive notice of Coleman's predicament and was thereby barred from attaining the status of a holder in due course.

Contrary to the trial justice's reasoning, Chase cannot be charged with the "notice" referred to in § 9–206(1) because of Coleman's inability to obtain a supply of Scotti's pipes or mufflers. Chase's status as a holder in due course and its notice of claims or defenses must be determined at the time the assignment was executed in May 1976, not at the time of Scotti's bankruptcy predicament in 1977. *Laurel Bank and Trust Co. v. Mark Ford, Inc.,* 182 Conn. 437, 442, 438 A.2d 705, 707 (1980). The record makes it quite clear that at the time the assignment was executed, the business relationship between Chase and Scotti was in apple-pie order and it probably remained that way until such time as Scotti became involved in insolvency litigation. Since Chase is accorded the status of a holder in due course, Coleman must pay.

The plaintiff's appeal is sustained, the judgment appealed from is vacated, and the case is remanded to the Superior Court for entry of judgment for the plaintiff, including the award of the counsel fee called for in the lease.