**CITICORP OF NORTH AMERICA, INC., Plaintiff,**

v.

**LIFESTYLE COMMUNICATIONS CORPORATION and James McBride, Defendants.**

**LIFESTYLE COMMUNICATIONS CORPORATION, Third–Party Plaintiff,**

v.

**HARRIS CORPORATION, BROADCAST DIVISION, Third–Party Defendant.**

No. 4–91–CV–30343.

United States District Court, S.D. Iowa, C.D.

Oct. 27, 1993.

Steven L. Nelson of Davis, Hockenberg, Wine, Brown, Koehn & Shors, Des Moines, IA, for Citicorp.

Ken J. Winjum of Grefe & Sidney, Des Moines, IA, for Lifestyle and McBride.

Richard A. Malm of Dickinson, Throckmorton & Parker, Des Moines, IA, for Harris.

## MEMORANDUM OPINION
## AND ORDER

BENNETT, United States Magistrate Judge.

### TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND ... 647
II. FINDINGS OF FACT ... 648
  A. The Parties ... 648
  B. Radio Equipment for KJJC–FM ... 648
  C. Asher and Citicorp ... 650
  D. The Lease Transaction ... 651
  E. Lease Provisions ... 654
III. CONCLUSIONS OF LAW ... 655
  A. Law to Be Applied ... 655
  B. Citicorp's Claims Against Lifestyle ... 655
    1. Hell or High Water Provision of the Master Lease ... 655
    2. Waiver of Defense Clause ... 657
  C. Lifestyle's Specific Defenses ... 658
    1. The Close Connection Doctrine ... 658
    2. Consideration ... 660
    3. Title to the Transmitter ... 661
    4. Condition Precedent ... 661
    5. Risk of Loss ... 662
  D. Lifestyle's Claims Against Harris ... 663
    1. Breach of Contract ... 663
    2. Conversion ... 664
    3. Negligence ... 665
    4. Contribution or Indemnity ... 666
      a. Contribution ... 666
      b. Indemnity ... 666
  E. Harris' Claims Against Citicorp and Lifestyle ... 667
    1. Claim Against Citicorp ... 667
    2. Claim against Lifestyle ... 668
IV. CONCLUSION ... 668
V. ORDER FOR JUDGMENT ... 668

### I. INTRODUCTION AND BACKGROUND

The circumstances of this case are regretful and " 'concerns, in its essence, the question of which of [three] basically innocent parties shall be made to bear a loss occasioned by the wrongful conduct of a third party who, because of financial incapacity, is unable to respond in damages.' " *International Harvester Credit Corp. v. Hill*, 496 F.Supp. 329, 332 (M.D.Tenn.1979) (quoting *Chemical Bank v. Penny Plate, Inc.*, 144 N.J.Super. 390, 365 A.2d 945, 951 (1976)).

In this civil action, Plaintiff Citicorp North America, Inc. ("Citicorp"), contends that Defendant Lifestyle Communications Corpora-

tion ("Lifestyle") has breached a lease agreement for a radio transmitter group and is liable for all payments due under the lease, plus interest and costs, including attorney fees. Citicorp further asserts that Defendant James McBride ("McBride"), Lifestyle's president, is also obligated for the lease payments due to a written guarantee.

Lifestyle and McBride, in turn, contend: that the lease transaction failed for lack of consideration; that the lease was subject to a condition precedent which did not occur; that title to the equipment which was the subject of the lease was voidable; that Citicorp acted in a commercially unreasonable manner in funding the lease thereby creating a risk of loss which precludes it from enforcing the lease; and that Citicorp was so closely connected to the lease's assignor that Citicorp should be precluded from enforcing the lease.

Third–Party Defendant Harris Corporation ("Harris"), the manufacturer of the radio transmitter which was the subject of the lease, contends that it is entitled to recover the balance due on a sales contract from Lifestyle.[1] Alternatively, Harris asserts that it is entitled to recover from Citicorp on the basis of enforcement of its security interest in the radio equipment, or on the grounds of restitution.

A bench trial commenced on April 14, 1993, and concluded on April 15, 1993. Citicorp was represented by Steven L. Nelson of Davis, Hockenberg, Wine, Brown, Koehn & Shors, Des Moines, Iowa. Lifestyle and McBride were represented by Ken J. Winjum of Grefe & Sidney, Des Moines, Iowa. Harris was represented by Richard A. Malm of Dickinson, Throckmorton & Parker, Des Moines, Iowa. The parties were requested to submit post-trial briefs, and closing arguments were then held on June 3, 1993. This litigation, while confusing factually and complex legally, was very well tried and briefed by each counsel for the parties.[2] The matter is now fully submitted.

## II. FINDINGS OF FACT

### A. The Parties

■ Plaintiff Citicorp is a Delaware corporation with its principal place of business in the State of New York. Citicorp is a financial services business. Defendant Lifestyle is an Iowa corporation with its principal place of business in the State of Iowa. Lifestyle owns and operates radio station KJJC–FM in Osceola, Iowa. McBride is an officer, director and the majority shareholder of Lifestyle. He is a resident of Massachusetts. Third-party Defendant Harris Corporation is a Delaware corporation with its principal place of business in Florida.[3] Jurisdiction in this court is due to diversity of citizenship. 28 U.S.C. § 1332.

### B. Radio Equipment for KJJC–FM

In the summer of 1990, Lifestyle began to seek to secure a replacement transmitter and antenna for its radio station KJJC–FM in Osceola, Iowa. One of the manufacturers of such equipment contacted by Lifestyle was Harris. On July 2, 1990, Harris employee Fred Brown prepared a proposal for a transmitter and an antenna for KJJC–FM. On August 13, 1990, Brown prepared a revised proposal for a transmitter group and an antenna. The total price for the equipment was $71,135.00. The price of the antenna

---

1. Harris also joins several of Lifestyle and McBride's defenses in arguing that Citicorp cannot enforce the lease.

2. The court agrees with Harris' assessment that "[t]his case presents issues disproportionate in their potential for complexity to the amount at issue. The initial briefs of the parties raise numerous difficult issues.... Obviously, the entire problem stems from the wrongful act of the middleman Asher, now bankrupt, in taking, but not remitting funding. The legal effect is considerably less obvious as the argument and briefing so far will attest. The ultimate question for decision is clear, however—who is to be left holding the bag for Asher's defalcation?" Resp. Br. of Harris Corp., p. 1, filed May 7, 1993.

3. It is clearly established that diversity jurisdiction attaches only when there is complete diversity of citizenship of parties. See Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806) (Marshall, J.); Stouffer Corp. v. Breckenridge, 859 F.2d 75, 76 (8th Cir.1988); 28 U.S.C. § 1332(a)(1), (c). Corporate litigants are conclusively presumed to be residents of the state of their incorporation. Breckenridge, 859 F.2d at 76.

group was $9244.00 and the price of the transmitter group was $61,891.00. After giving Lifestyle a discount of $10,534.25, the total price of the equipment was $60,600.75. At approximately this time, McBride contacted Harris regarding leasing the Harris radio equipment.

Harris employee Christine Grimm gave McBride the name of Dana Leasing as a possible leasing company. Lifestyle subsequently made application with Dana Leasing concerning the leasing of the Harris equipment. On August 16, 1990, Grimm learned from Dennis Alexander at Dana Leasing that Lifestyle's application had been rejected by Dana Leasing because of Lifestyle's negative net worth, negative cash flow and consecutive years of loss. Grimm informed McBride about Dana Leasing's decision, and gave him the names of other leasing companies to contact.

McBride, who had seen a magazine advertisement for Exchange National Funding ("Exchange National"), made application with Exchange National about brokering a lease for the Harris radio equipment. On August 27, 1990, McBride informed Grimm that Lifestyle's application had been approved and that Exchange National was splitting Lifestyle's equipment purchase with two companies. Grimm told McBride that because of the difference in the costs of the two equipment groups Lifestyle's order could not be split. McBride replied that he didn't want to do anything wrong.

On August 28, 1990, Grimm contacted Chris Simpson at Exchange National regarding the Lifestyle sale. Simpson informed Grimm that Exchange National had already placed $25,000 of the Lifestyle purchase, and was working to secure financing for the other portion of the Lifestyle deal. In response, Grimm informed Simpson that Harris would not split the invoice for the Lifestyle purchase to indicate a sale of $24,000 for the antenna group and $29,000 for the transmitter group.[4]

On the Labor Day weekend in September of 1990, lightning struck KJJC–FM's antenna, severely damaging the radio station's transmitter and causing the station to be knocked off the air. On September 4, 1990, after being informed about the station being off the air, Grimm contacted Simpson at Exchange National regarding the financing of Lifestyle sale. Simpson again informed Grimm that only $25,000 of the transaction had been financed.[5]

A revised proposal was prepared by Fred Brown on September 4, 1990. The revised proposal was identical to the one Harris submitted to Lifestyle on August 13, 1990. On September 5, 1990, McBride signed the proposal in his capacity as President of Lifestyle.[6] The proposal requested a shipment date of September 17, 1990, for the antenna, and the transmitter would be picked up on "Friday." The latter was a reference to Friday, September 7, 1990. The executed proposal stated that:

> Title to all equipment supplied by Harris hereunder shall pass to you at the point that the equipment is loaded on board (FOB) the carrier's equipment for shipment to your facility.

> Until all payment obligations herein have been satisfied, (whether represented by notes, open account, judgment or otherwise) you hereby grant to Harris a security interest in all of the equipment supplied and Harris may avail itself of all rights and remedies of a secured creditor under applicable law....

Lifestyle was anxious to pick up the new transmitter in order to get KCCJ–FM back on the air. Because only $25,000 of lease financing had been arranged, Lifestyle was required by Harris to come up funds to

---

4. Splitting the invoice would have the effect of creating a lease with assets having a negative equity. In this instance, if the invoice had been split as requested by Simpson, the $9,244.00 antenna would have been the subject of a $24,000 lease.

5. The significance of $25,000 is that leasing companies generally do not require financial state-

ments from prospective lessees for amounts under $25,000.

6. The only difference between the executed proposal of September 4, 1990, and the unexecuted proposal of August 13, 1990, is that the executed proposal has handwritten details inserted in available spaces for the frequency of the transmitter and the antenna, and for shipping details.

assure payment of the balance of the cost of the transmitter group, before it would release the equipment. On September 5, 1990, Harris received a $39,750 wire transfer from Lifestyle's local bank. On the following day, September 6, 1990, Grimm again discussed with Exchange National what documents Harris would require in order to issue an invoice.

On September 7, 1990, Exchange National told Grimm the funder for the lease was to be First Portland Leasing Company ("First Portland"), and that the company required Harris to issue an invoice for $25,000. Grimm informed Exchange National that she could issue an invoice showing the total price of the equipment and Harris' remaining balance of $25,000. This arrangement was unsatisfactory to Exchange National because First Portland would only accept leases on equipment up to $30,000. Exchange National then inquired whether, upon receipt of $25,000, Harris would produce an invoice as directed. Harris rejected this proposition as well as Exchange National's overture that upon receipt of $25,000, Harris produce a blank invoice which Exchange National could complete.

When Steve Russell of Lifestyle arrived on September 7, 1990, to pick up the transmitter he was informed by Grimm about the current situation and that the transmitter could not be released unless Harris had some assurance of full payment. Lifestyle obtained a letter of credit from its bank, the Clarke County State Bank, Osceola, Iowa, indicating that payment of $25,000 would be made by September 14, 1990. Both Lifestyle and Harris intended that Lifestyle would get an immediate refund from Harris when the funding for the lease was completed by Asher. Lifestyle and Harris anticipated that the lease would be completed in a short period of time—less than a couple of weeks. With this assurance from Lifestyle's bank, Harris released the transmitter to Russell.[7] Harris executed shipping release number 94356–01 for the transmitter. The shipping release states that the transmitter was sold to:

7. Subsequently, a lease agreement was completed with First Portland Leasing for the Harris antenna group. On September 11, 1990, Harris issued an invoice for $10,241.25 for the antenna

KJJC
LIFESTYLE COMMUNICATIONS INC.

Harris also issued a "sales order acknowledgement" to KJJC–FM on September 7, 1990. The Harris sales acknowledgement states that the transmitter was sold to Lifestyle. It also contains the following acknowledgment:

## ACKNOWLEDGMENT

We accept your order which has been entered as shown below. If your order was submitted on one of our standard proposal and acceptance forms, this acknowledgement, including any changes in specifications or prices from the proposal and acceptance (as authorized in the acceptance provision therein), constitutes our acceptance of it. If your order was submitted otherwise, it is accepted expressly conditional upon your assent to the terms and conditions set forth below and on the reverse side hereof which shall be deemed to be included in your order.

Please advise us promptly, and in any event, within ten (10) days from the date hereof, if your order has not been entered correctly.

When communicating with us concerning this order, please mention the **HARRIS ORDER NUMBER.**

The transmitter was subsequently installed at KCCJ–FM and has been in use since then without incident.

### C. Asher Capital and Citicorp

Jim Denning started Asher Leasing Company as a sole proprietorship in 1986. In 1988, Denning joined with two investors to form XYZ Asher Corporation ("XYZ Asher") which continued the leasing activities of Asher Leasing Company. After a falling out between Denning and the other principals at XYZ Asher in the summer of 1989, Denning left XYZ Asher and formed J.D. Asher Cor-

group to First Portland. On October 9, 1990, First Portland paid Harris for the antenna group. The antenna, which was installed at KJJC–FM, has been in use without incident.

poration ("Asher") in October 1989.[8] J.D. Asher was a holding corporation comprised of four separate companies: Asher Computer Group, Asher Telecom Group, Asher Equipment Group, and Asher Capital Corporation. As of December 31, 1989, Asher's balance sheet showed that it had fixed assets of $67,772.32 and $3,248.71 in cash on hand.[9]

In its leasing actions, Asher typically sent out its payment to the vendors of the equipment which were the subject of the leases a day before the funding source sent out its payment to Asher. Citicorp, however, preferred that it directly fund the lease equipment vendors, but permitted paying its vendors directly on some occasions. When Asher was going to pay its vendors directly, Asher was required to submit to Citicorp a bill of sale, an invoice and copies of cancelled checks. In the summer of 1990, Asher first contacted Citicorp regarding the funding of lease transactions. By October 5, 1990, Citicorp had funded eight leasing transactions with Asher for approximately $292,000.

Asher was an independent lease broker, and not an agent of Citicorp. Although Citicorp was a funding source for Asher's leasing transactions, Citicorp was not Asher's exclusive financier nor was Asher required to submit all of its transactions to Citicorp before seeking funding elsewhere.[10] Citicorp rejected the majority of funding proposals submitted by Asher.[11] McBride, on behalf of Lifestyle, was aware that Citicorp, and not Asher, held the discretion whether to finance the lease transaction.

### D. The Lease Transaction

On September 11, 1990, Harris prepared an invoice for $53,125 to Asher Capital Corporation. During this time period, Lifestyle was pressing Harris to complete the neces-

sary arrangements for the lease financing in order that Lifestyle could get its $39,750 in funds back from Harris. On September 13, 1990, Citicorp first learned of Lifestyle's transaction. In order to facilitate completion of the lease financing, on September 19, 1990, McBride signed a "Master Lease Agreement," "a "Delivery and Acceptance Certificate," a Written Guarantee," and a "Notice and Consent to Assignment." [12]

The Master Lease Agreement and Written Guarantee had been prepared by Citicorp. Also on September 19, 1990, Lifestyle issued a check to Asher for $2,760.00. Under the Master Lease, Lifestyle was obligated to make 60 monthly lease payments of $1,370.36. Specific significant portions of the Master Lease are set out *infra* at section II(E). On the same day, Exchange National faxed a "Bill of Sale" form to Harris for execution along with a request that Harris mail it back to Exchange National with the original invoices.

On approximately September 19, 1990, Exchange National informed Harris that it would require Harris to issue a bill of sale to Asher prior to Asher making payment to Harris. Exchange National faxed a copy of a bill of sale to Harris. Because Grimm was not accustomed to dealing with bills of sale in the ordinary course of her duties at Harris, she contacted Harris' in-house counsel regarding execution of the bill of sale. Grimm was informed by legal counsel to notify Lifestyle about the need to issue the bill of sale, and to get a written acknowledgement from Lifestyle that the equipment was not encumbered.

On September 21, 1990, Grimm had a telephone conversation with McBride regarding whether the equipment was free of all liens

---

8. Litigation between XYZ Asher and Asher subsequently ensued when Denning recruited several of XYZ Asher's employees to follow him to Asher.

9. Asher's fixed assets were the subject of long term liabilities of $63,384. Thus, Asher's fixed assets had a net value of $4,388.32 on December 31, 1989.

10. As of October 1990, Asher's two primary lease funding sources were GE Capital and Phoenix Microsystems with $5.5 million in funding.

11. During their relationship, Asher submitted over 100 transactions to Citicorp. By early October 1990, Citicorp made known to Asher its intention to limit Asher to approximately one million dollars per year in lease funding.

12. In the written guarantee, McBride personally guaranteed all of Lifestyle's obligations under the Master Lease.

and encumbrances. During this brief conversation, Grimm read the text of the bill of sale that Harris was going to send to Asher, and inquired whether the equipment was free of liens. Grimm did not reveal, nor did McBride inquire, what the possible legal consequences were of sending Asher a bill of sale for the equipment. Grimm asked that McBride provide her with a written affirmance that the equipment was unencumbered. In response to this conversation, later on September 21, 1990, McBride faxed a letter to Grimm at Harris. The text of the letter stated:

> Per our conversation the transmitter is free and clear of any encumbrances or liens.

> Upon receipt of funding from Asher Capital please send a check for $39,750 to me made out to Lifestyle Communications, Corp.[13]

Subsequently, on September 21, 1990, Harris executed a bill of sale and Grimm faxed it to Asher.[14] The bill of sale stated:

> FOR GOOD CONSIDERATION, AND IN PAYMENT OF THE SUM OF $53,125.00, (FIFTY THREE THOUSAND, ONE HUNDRED TWENTY FIVE DOLLARS AND NO/100S), THE UNDERSIGNED (SELLER), HEREBY SELLS AND TRANSFERS TO ASHER CAPITAL, (BUYER), THE FOLLOWING CHATTELS AND PERSONAL PROPERTY:

> 1 HT20FM 20KW FM BROADCAST TRANSMITTER

> 1 SPARE 8990 PA TUBE

> 1 R–SK HT20FM SEMI–CONDUCTOR & FUSE KIT

> 1 RECOMMENDED SEMI–CONDUCTOR/FUSE KIT

> 1 RECOMMENDED SERVICE PARTS KIT

> THE SELLER WARRANTS IT HAS GOOD TITLE TO SAID PROPERTY, FULL AUTHORITY TO SELL AND TRANSFER SAME, AND THAT SAID PROPERTY IS SOLD FREE OF ALL LIENS, CLAIMS AND ENCUMBRANCES.

At no time prior to its execution of the bill of sale did Harris inform Citicorp that it had previously received $39,750 from Lifestyle as security and that the equipment had been installed prior to execution of the Master Lease. Upon receipt of the bill of sale, Asher sent it and the other transaction documents to Citicorp. These transactional documents included the Master Lease, the lease schedule, the assignment of the lease, the delivery and acceptance certificate, McBride's personal guarantee, and a copy of a check receipt from Asher to Harris in the amount of $53,125. Asher sent the documents to Citicorp.[15] On October 23, 1990, Citicorp and Asher executed a purchase of paper agreement on a form prepared by Citicorp. On October 24, 1990, Citicorp approved the Lifestyle lease for funding.[16] Subsequently, on October 25, 1990, Citicorp wired $58,437.50 to Asher for the Lifestyle

13. Although McBride testified that he would have required return of the $39,750, which Lifestyle had provided to Harris to secure release of the equipment, before he would have authorized release of Lifestyle's interests in the radio equipment, the court concludes to the contrary. At no time while lease financing arrangements were being made did McBride make such a requirement known to Grimm or Exchange National. McBride and Lifestyle's primary concern was to obtain the lease financing, and McBride was willing to take all necessary steps to obtain that financing. Indeed, while McBride is no doubt astute about the operation a small town radio station, he had little, if any, understanding or knowledge regarding commercial lease agreements. He was also desperate to get KCCJ–FM back on the air. McBride was therefore willing to sign or do virtually anything Harris or Asher requested of him.

14. The bill of sale, along with the other original documents related to the lease transaction, were sent by Asher to Citicorp. Although Citicorp was only able to locate a facsimile copy of the bill of sale, the court finds that the original was indeed sent to Citicorp where it was somehow misplaced.

15. The complete list of transactional documentation is set out on Asher's "DOCUMENTATION CHECKLIST."

16. In deciding whether to purchase the assignment from Asher, Citicorp relied on the documents submitted by Asher including the bill of sale and the invoice.

lease.[17] At no time prior to sending the money to Asher did Citicorp contact Harris directly regarding the leasing of the radio transmitting equipment. Neither Harris nor Lifestyle requested that Citicorp transmit the purchase price for the equipment directly to Harris. When Citicorp transmitted the funds to Asher it was unaware that Asher had not paid Harris or of any other problems with the leasing transaction.[18]

Thus, as of October 25, 1990, the transactions which should have occurred if all had gone as planned would appear as follows:

Events, however, did not go as planned. Harris never received payment from Asher. On October 29, 1990, McBride contacted Harris to ascertain whether it had received payment from Asher. Upon being informed that no payment had been forthcoming, he said that he would contact Asher directly. Later that day, Steve Horn of Asher contact-ed Grimm at Harris and told her that Asher would send, via Federal Express, a check the next day, November 1, 1990. When no check from Asher arrived and after again being contacted by McBride, Grimm called Horn.

On November 7, 1990, Asher paid $5,312.50 to Harris. On November 13, 1990,

---

17. The actual wire transfer was for $170,273.59. This transfer was for the funding of five other leases and the Lifestyle lease. Asher had made representations to Citicorp that Asher had a private investor for the short term funding of lease transactions.

18. The court believes that Asher knowingly set out to deceive Citicorp into believing that a check had been sent by it to Harris for payment of the equipment when it sent Citicorp a copy of a check receipt indicating that a check had been issued to Harris. There is no reliable evidence that Asher ever issued a check to Harris. Furthermore, Asher, grossly undercapitalized as it was, needed funds at this point and knew that Citicorp would transmit funds to it only if it had documentation that Asher had already issued payment to Harris.

Horn called Grimm and explained that Asher had expended the funds received from Citicorp on legal fees unrelated to the Harris/Lifestyle transaction and was unable to make full payment at that time. Horn sought to set up a payment plan. On November 19, 1990, Lifestyle made a payment on the lease to Citicorp in the amount of $1,370.36. Lifestyle made no additional payments due under the lease. Later, on November 28, 1990, Asher informed McBride and Harris that it intended to make three additional payments totalling $47,812.50 on the radio equipment over the next three months. No further payments were made by Asher.

Thus, the following graph illustrates how the transactions actually transpired.

In December of 1990, Asher filed bankruptcy in the United States District Court for the Northern District of Texas. On April 15, 1991, Harris filed a proof of claim against Asher in bankruptcy court in which it asserted that Asher was a debtor of Harris in the sum of $47,812.50, and that this indebtedness was incurred as a result of the lease transaction. Harris refused to return Lifestyle's $39,750 deposit due to the fact that it had not been paid by Asher. Lifestyle, in turn, withheld the lease payments due in December of 1990 and January of 1991. On January 4, 1991, Citicorp demanded that Lifestyle make prompt payment of the overdue lease payments. On February 7, 1991, when Lifestyle refused this overture, Citicorp notified Lifestyle that it was in default of the lease and demanded full payment under the lease. Lifestyle made no further payments under the lease.

### E. Master Lease Provisions

The Master Lease contains several provisions which are key to the resolution of this case. These provisions are the "hell or high water" clause, the waiver of defense clause and the merger clause.

Paragraph 2 of the Master Lease, the "hell or high water clause" provision, states:

LESSEE ACKNOWLEDGES AND AGREES THAT LESSEE'S OBLI-

GATION TO PAY ALL RENTAL PAYMENTS DUE OR TO BECOME DUE HEREUNDER FOR THE TERM SHALL BE ABSOLUTE AND UNCONDITIONAL AND SHALL NOT BE SUBJECT TO ANY REDUCTION, SETOFF, DEFENSE, COUNTERCLAIM OR DEFERMENT FOR ANY REASON WHATSOEVER.

Paragraph 12 of the Master Lease, the waiver of defense clause, states:

Lessee acknowledges that Lessor may sell and/or assign its interests in the equipment and/or this Lease to Citicorp North America, Inc. (herein, with its successors and assigns, "Assignee") and that Assignee may further sell and/or assign its interest in the equipment and/or this Lease. LESSEE AGREES NOT TO ASSERT AGAINST ASSIGNEE ANY DEFENSE, SETOFF, RECOUPMENT, CLAIM OR COUNTERCLAIM, HOWEVER ARISING, THAT LESSEE MAY HAVE AGAINST LESSOR. ASSIGNEE SHALL HAVE ALL THE RIGHTS, REMEDIES, POWERS AND PRIVILEGES OF LESSOR HEREUNDER BUT SHALL HAVE NONE OF THE OBLIGATIONS OF LESSOR HEREUNDER.

The Master Lease also contains the following merger clause which provides that:

This Lease, consisting of the foregoing, and THE REVERSE SIDE HEREOF, correctly sets forth the entire agreement between the Lessor and Lessee with respect to the use, possession and lease of the Equipment. No agreements or understandings concerning the foregoing shall be binding on either of the parties hereto unless specifically set forth in this Lease. The term "Lessee" as used herein shall mean and include any and all Lessees who sign hereunder, each of whom shall be jointly and severally bound thereby. This

Lease will not be binding on Lessor until accepted below.

### III. CONCLUSIONS OF LAW

*(Including Some Additional Findings of Fact and Ultimate Findings of Fact)*

#### A. Law to Be Applied

The court's jurisdiction in this case is solely predicated on the parties' diversity of citizenship. Therefore, under *Erie R.R. v. Thompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938), the law of the forum state shall be applied. The parties do not dispute that Iowa law governs the substantive issues in this case.

#### B. Citicorp's Claims Against Lifestyle

■ 1. Hell or High Water Provision of the Master Lease. Initially, the court takes up Citicorp's argument that it has an absolute right to lease payments under the provision of the Master Lease known as the hell or high water clause. Paragraph 2 of the Master Lease states:

LESSEE ACKNOWLEDGES AND AGREES THAT LESSEE'S OBLIGATION TO PAY ALL RENTAL PAYMENTS DUE OR TO BECOME DUE HEREUNDER FOR THE TERM SHALL BE ABSOLUTE AND UNCONDITIONAL AND SHALL NOT BE SUBJECT TO ANY REDUCTION, SETOFF, DEFENSE, COUNTERCLAIM OR DEFERMENT FOR ANY REASON WHATSOEVER.

The Master Lease's unambiguous language in this paragraph clearly indicates an intent on the part of Lifestyle that Lifestyle would be under an unconditional obligation to make the lease payments which was separate and distinct from any contractual obligation of Asher.[19]

---

**19.** The rationale undergirding leases was explained by Professors White and Summers in their treatise on the subject:

[T]he parties have actually entered into a financing transaction in which the lessor is really lending money and dealing largely in paper rather than goods. Put another way, the lessor as a lender has no interest in how the lessee as

a debtor chooses to spend the money for goods. If the lessee should order an aircraft which is unsuitable or defective, this is not the lessor's problem. The lessor's responsibility is merely to provide the money not to instruct the lessee like a wayward child concerning a suitable purchase.... Absent contrary agreement, even if our Boeing 747 explodes into

Such clauses are common in the commercial leasing industry. The effects of hell or high water clauses have been noted:

"Under the hell or high water provision, the lessee undertakes to pay rentals ... once the lessee has formally accepted the property.... Whether the property functions satisfactorily, is useful to the lessee, is suitable for the purpose intended, or is lost, stolen, condemned, or destroyed, and whether the lessee has any right of offset against the lessor or the lenders, is irrelevant. In short, rent payments continue to come hell or high water, without any reduction or offset, even if the lessee is wrongfully dispossessed of the equipment by the lessor...."

*Colorado Interstate Corp. v. CIT Group/Equipment Fin.*, 993 F.2d 743, 749 (10th Cir.1993) (quoting 1 Bruce E. Fritch & A. Reisman, *Equipment Leasing–Leveraged Leasing* 152–53 (3d ed. 1988)).[20]

Federal courts have uniformly upheld the validity of hell or high water provisions, concluding that a lessor's breach of its duty to perform is a separate and distinct issue from the lessee's duty to make its lease payments. *See id.* at 751; *American Computer v. Jack Farrell Implement Co.*, 763 F.Supp. 1473, 1484 (D.Minn.1991), *aff'd*, 967 F.2d 1208 (8th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 414, 121 L.Ed.2d 338 (1992); *Philadelphia Sav. Fund Soc'y v. Deseret Management Corp.*, 632 F.Supp. 129, 135–36 (E.D.Pa. 1985); *In re O.P.M. Leasing Serv., Inc.*, 21 B.R. 993, 1006–07 (Bankr.S.D.N.Y.1982).[21] The reasoning underlying such decisions was set out recently by the Tenth Circuit in *Colorado Interstate Corp.*:

"To deny this clause its full force and effect would effectively reconstruct the contract contrary to the intent of the parties, which reconstruction would be impermissible.

Moreover, it is a well-settled principle that 'parties to a contract are given broad latitude within which to fashion their own remedies for breach of contract.... It follows that contractual limitations upon remedies are generally to be enforced unless unconscionable.'

. . . .

The essential practical consideration requiring liability as a matter of law in these situations is that these clauses are essential to the equipment leasing industry. To deny their effect as a matter of law would seriously chill business in this industry because it is by means of these clauses that a prospective financier-assignee of rental payments is guaranteed security for his outright loan to the lessor. Without giving full effect to such clauses, if the equipment were to malfunction, the only security for this assignee would be to repossess equipment with substantially diminished value."

*Colorado Interstate Corp.*, 993 F.2d at 748 (quoting *In re O.P.M. Leasing Serv., Inc.*, 21 B.R. at 1006–07.

■ With this background, the court directs its attention to the parties' contentions. Citicorp argues that the Master Lease's hell or high water clause is dispositive of Citicorp's claims against Lifestyle. Lifestyle, on

---

small pieces in flight and is completely uninsured, lessee's obligation to pay continues.
1A James A. White & Robert S. Summers, *Uniform Commercial Code* 25 (3d ed. 1991).

**20.** As one commentator on the subject has noted:

Finance leases frequently contain a "hell or high water" rent commitment. Under this type of obligation, a lessee is required to unconditionally pay the full rent when due. He is not permitted to make any deduction even though he has a legitimate claim against the lessor for money owed. This is not as bad as it sounds for a lessee, since he can still bring a lawsuit against the lessor for any claims.
Richard M. Contino, *Legal and Financial Aspects of Equipment Leasing Transactions* 29 (1979).

**21.** Although neither Iowa appellate court has considered the issue of the validity of hell or high water lease provisions in a written decision, appellate courts in other states have uniformly upheld the general validity of such provisions. *See e.g. Chemical Bank v. Riden Professional Ass'n*, 126 N.H. 688, 693, 498 A.2d 706, 711 (1985); *Stewart v. United States Leasing Corp.*, 702 S.W.2d 288, 290 (Tex.Ct.App.1985); *Dillman & Assoc., Inc. v. Capitol Leasing Co.*, 110 Ill.App.3d 335, 343, 66 Ill.Dec. 39, 45, 442 N.E.2d 311, 317 (1982); *Dixie· Groceries, Inc. v. Albany Business Mach.*, 156 Ga.App. 36, 274 S.E.2d 81, 88 (1980); *National Equip. Rental v. J & I. Carting, Inc.*, 73 A.D.2d 666, 667, 423 N.Y.S.2d 205, 206 (N.Y.App.Div.1979); *St. Paul Leasing Co. v. Winkel's, Inc.*, 309 Minn. 583, 588, 244 N.W.2d 661, 662 (1976).

the other hand, contends that the hell or high water clause does not foreclose it from asserting its specific defenses in this action. Finding that the logic of the *Colorado Interstate* decision upholding the validity of hell or high water provisions to be persuasive, the court concludes that the Master Lease's hell or high water clause severed Lifestyle's duty to make the lease payments from Asher's duty to perform its obligations under the contract. *Id.* at 749. The court further concludes, for the reasons detailed below, that the individual defenses asserted by Lifestyle do not render this provision of the Master Lease inoperable and that Citicorp is entitled to judgment on its claims against Lifestyle.

■ *2. Waiver of Defense Clause.* The second key provision of the Master Lease is the "waiver of defense" clause found in paragraph 12. It states:

> Lessee acknowledges that Lessor may sell and/or assign its interests in the equipment and/or this Lease to Citicorp North America, Inc. (herein, with its successors and assigns, "Assignee") and that Assignee may further sell and/or assign its interest in the equipment and/or this Lease. LESSEE AGREES NOT TO ASSERT AGAINST ASSIGNEE ANY DEFENSE, SETOFF, RECOUPMENT, CLAIM OR COUNTERCLAIM, HOWEVER ARISING, THAT LESSEE MAY HAVE AGAINST LESSOR. ASSIGNEE SHALL HAVE ALL THE RIGHTS, REMEDIES, POWERS AND PRIVILEGES OF LESSOR HEREUNDER BUT SHALL HAVE NONE OF THE OBLIGATIONS OF LESSOR HEREUNDER.

Iowa Code § 554.9206(1) specifically permits for a valid waiver of defenses and reads:

> 1. Subject to any statute or decision which establishes a different rule for buyers or lessees of consumer goods, an agreement by a buyer or lessee that the buyer or lessee will not assert against any assignee any claim or defense which the buyer or lessee may have against seller or lessor is enforceable by an assignee who takes that assignee's assignment for value, in good faith and without notice of a claim or defense, except as to defenses of a type which may be asserted against a holder in due course of a negotiable instrument under the Article on Commercial Paper (Article 3). A buyer who as part of one transaction signs both a negotiable instrument and a security agreement makes such an agreement.

As was the case with the hell or high water clauses, waiver of defense clauses are a common practice in the leasing industry and have been regularly enforced by courts. *See Leasing Serv. Corp. v. Crane,* 804 F.2d 828, 835–36 (4th Cir.1986); *Leasing Serv. Corp. v. River City Constr., Inc.,* 743 F.2d 871, 875–78 (11th Cir.1984); *Chase Manhattan Bank v. Lake Tire Co.,* 496 N.E.2d 129, 134 (Ind.Ct. App.1986); *Chemical Bank v. Rinden Professional Ass'n,* 126 N.H. 688, 692, 498 A.2d 706, 711 (1985); *Chase Manhattan Bank, N.A. v. Coleman,* 496 A.2d 935, 938 (R.I. 1985).[22] Due to the tremendous protection these waiver of defense clauses bestow upon lease assignees, these clauses are enforceable by an assignee only if the assignee takes the assignment for value, in good faith and without notice of any claim or defense. *River City Constr., Inc.,* 743 F.2d at 875; *see also Crane,* 804 F.2d at 835; *Chemical Bank,* 126 N.H. at 693, 498 A.2d at 711; *Lake Tire Co.,* 496 N.E.2d at 133; *Coleman,* 496 A.2d at 937.[23]

■ Citicorp has met each of these requirements here. First, Citicorp took the assignment from Asher for value, having paid $58,437.50 to Asher. Second, the court concludes that the assignment was taken in good faith. In reaching this conclusion, for the reasons fully expressed below, *see infra* at 659–60, the court specifically rejects Lifestyle's contention that Citicorp lacked good faith in taking the assignment because of

---

**22.** The court has not located Iowa precedent regarding the applicability of waiver of defense clauses under similar circumstances, nor have the parties directed the court's attention to any such authority.

**23.** It is irrelevant that the document in question here was a lease rather than a regular negotiable instrument. Citicorp, as an assignee, may still enjoy the same status as a holder in due course. *River City Constr., Inc.,* 743 F.2d at 875.

close connections between Citicorp and Asher.[24] Third, Citicorp took the assignment without actual notice of a claim or defense by Lifestyle. Because Citicorp took its assignment for value, in good faith and without prior notice of defenses or claims, Citicorp is entitled to the same protection as those afforded a holder in due course. *See Crane*, 804 F.2d at 835. Thus, in order for Lifestyle to prevail it must demonstrate either that Citicorp is not entitled to holder in due course status or that it has a defense which lie against a holder in due course.[25] *River City Constr., Inc.*, 743 F.2d at 875. The court, however, for the reasons discussed below, concludes that Lifestyle cannot prevail on the asserted defenses. Therefore, Citicorp is entitled to judgment against Lifestyle for that relief requested in its complaint.

### C. Lifestyle's Specific Defenses

Lifestyle has raised several defenses to Citicorp's claim. The court concludes, however, that Lifestyle's asserted defenses are invalid with respect to Citicorp's claim. Each of Lifestyle's defenses will be discussed below seriatim.

**1. The Close Connection Doctrine.** In asserting the close connection doctrine, Lifestyle contends that Citicorp is not entitled to assume the status of a holder in due course because of Citicorp's relationship with Asher. In *Bankers Trust Co. v. Crawford*, 781 F.2d 39 (3d Cir.1986), the court of appeals concisely described the doctrine:

"A transferee does not take an instrument in good faith when the transferee is so closely connected with the transfer that the transferee may be charged with knowledge of an infirmity in the underlying action."

*Id.* at 43 (quoting *Arcanum Nat'l Bank v. Hessler*, 69 Ohio St.2d 549, 554, 23 O.O.3d 468, 471, 433 N.E.2d 204, 209 (1982)). The court went on to point out that the close connection doctrine:

"was developed in part because of the difficulty of proving the transferee's actual knowledge of problems in the underlying transaction. The doctrine allows the court to imply knowledge by the transferee when the relationship between the transferee and transferor is sufficiently close to warrant such an implication."

*Id.* (quoting *Arcanum Nat'l Bank*, 69 Ohio St.2d at 557, 433 N.E.2d at 211). Similarly, in *Slaughter v. Jefferson Fed. Sav. & Loan Ass'n*, 538 F.2d 397, 400 (D.C.Ct.App.1976), the court described the doctrine:

Courts deny holder in due course status to a noteholder who was involved in or intimately connected with the sale or transaction which generated the note; having taken part in the original transaction with the borrower the noteholder cannot thereafter stand aloof as a holder in due course and in good faith.

The typical application of the close connection doctrine has been in consumer credit cases in which a finance company works in close conjunction with a selling entity. *See River City Constr., Inc.*, 743 F.2d at 876. Furthermore, the close connection doctrine

---

**24.** Under this theory, labeled the "close connection doctrine" by commentators, notice may be attributed to an assignee because of the assignee's close relationship with an entity having actual notice. *See* 1 White & Summers, *supra* at 712–13.

**25.** Iowa Code § 554.3305 sets out defenses which can be asserted against a holder in due course. Section 554.3305 states:
To the extent that a holder is a holder in due course the holder takes the instrument free from
1. all claims to it on the part of any person; and
2. all defenses of any party to the instrument with whom the holder has not dealt except

a. infancy, to the extent that it is a defense to a simple contract; and
b. such other incapacity, or duress, or illegality of the transaction, as renders the obligation of the party a nullity; and
c. such misrepresentation as has induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms; and
d. discharge in insolvency proceedings; and
e. any other discharge which the holder has notice when the holder takes the instrument.

has not been universally adopted. *See Crawford,* 781 F.2d at 43 (affirming district court's decision that the Pennsylvania Supreme Court would not adopt the doctrine if presented with the opportunity to do so); *Fidelity Bank v. Avrutick,* 740 F.Supp. 222, 236 n. 11 (S.D.N.Y.1990) (noting that doctrine "seems not to have been accepted by many courts, probably because it disregards the subjective standard of actual notice that has been codified in the Uniform Commercial Code.").

■ The Iowa Supreme Court has not yet decided whether it would endorse application of the close connection doctrine. Here, Lifestyle has not demonstrated that the Iowa Supreme Court, given the opportunity to do so, would adopt the close connection doctrine. Lifestyle has cited no legal authorities which would support such a premise. Although the court has serious concerns as to whether the Iowa Supreme Court would adopt the close connection doctrine, the court need not resolve this conundrum. Assuming, arguendo, that the Iowa courts would adopt the close connection doctrine, the court concludes that Lifestyle has failed to demonstrate that Citicorp and Asher had such a close relationship in the execution of the lease that it would be appropriate herein to impute Asher's knowledge regarding the transaction to Citicorp and thus obviate Citicorp's holder in due course status.

In *Unico v. Owen,* 50 N.J. 101, 232 A.2d 405 (1967), the New Jersey Supreme Court set out the following test for determining whether a sufficiently close connection existed:

> [W]hen it appears from the totality of the arrangements between [seller] and financier that the financier has had a substantial voice in setting standards for the underlying transaction, or has approved the standards established by the [seller], and has agreed to take all or a predetermined or substantial quantity of the negotiable paper which is backed by such standards, the financier should be considered a partic-

ipant in the original transaction and therefore not be entitled to a holder in due course status.

*Id.* at 417; *see also St. James v. Diversified Commercial Fin. Corp.,* 102 Nev. 23, 26, 714 P.2d 179, 181 (1986) (adopting *Unico* test). Upon application of this test to the facts of this case, the court concludes that Lifestyle has failed to establish a sufficiently close relationship between Asher and Citicorp here as to warrant application of the close connection doctrine.

First, the court notes that Asher and Citicorp are completely separate entities which share no common officers or directors. *See Rinden Professional Ass'n,* 126 N.H. at 694, 498 A.2d at 712.[26] Second, Citicorp and Asher engaged in an arms length transaction with respect to the assignment of the lease. Asher was under no obligation to offer the Lifestyle lease assignment to Citicorp and Citicorp was similarly under no obligation to accept this nor any lease generated and submitted by Asher. Third, Asher was not under any obligation to submit a certain percentage of its leases to Citicorp and Citicorp was under no obligation to take a predetermined or substantial quantity of the leasing transactions generated by Asher. Indeed, Citicorp refused most of Asher's requests for funding other proposed lease agreements. Fourth, Citicorp played no part in either arranging or negotiating the lease transaction between Asher and Lifestyle.

Neither the fact that Citicorp's name appeared on some of the boilerplate forms nor that Citicorp required a waiver of defense clause are determinative on this issue. *See River City Constr., Inc.,* 743 F.2d at 876 (noting that "[g]enerally, it is not enough that a creditor furnishes forms for a transaction. Such a practice is common in the world of commercial transactions."); *see also Equico Lessors, Inc. v. Ramadan,* 493 So.2d 516, 519 (Fla.Dist.Ct.App.1986) (holding that close connection doctrine was inapplicable in case where lease assignee provided pre-printed assignment forms naming it as assignee).

---

**26.** Even when courts have found some overlapping of officers or board members, that finding has not resulted the court's application of the close connection doctrine. *See Avrutick,* 740

F.Supp. at 237 (concluding not to apply close connection doctrine even though lessor and assignee had a common board member).

Likewise, the fact that Citicorp was aware of Asher's limited financial resources does not establish that the two entities had a sufficiently close relationship that it warrants the court's lifting of Citicorp's holder in due course status. Citicorp was unaware that Asher had not actually sent payment to Harris, and had no reason to suspect that Asher had not done so in this instance.[27] Therefore, based on the totality of the facts, the court concludes that Lifestyle has failed to establish such a close relationship between Asher and Lifestyle as would justify imposition of the close connection doctrine and setting aside the waiver of defense clause.

■ *2. Consideration.* The next issue to be addressed is Lifestyle's argument that there was a failure of consideration on the part of Asher in the formation of the lease. The burden of proof is on Lifestyle to show that there was a failure of consideration. *Citizens First Nat'l Bank of Storm Lake v. Turin,* 431 N.W.2d 185, 187 (Iowa Ct.App. 1988); *Northwestern Nat'l Bank of Sioux City v. Verschoor,* 230 N.W.2d 505, 507 (Iowa 1975). Consideration has been defined by the Iowa Supreme Court as " 'a benefit to the promisor or a loss or detriment to the promisee.' " *Federal Land Bank v. Woods,* 480 N.W.2d 61, 66 (Iowa 1992) (quoting *Test v. Heaberlin,* 254 Iowa 521, 523, 118 N.W.2d 73, 74 (1962)).[28] As the Iowa Supreme Court explained in *Woods:*

> There is a substantive difference between lack of consideration and failure of consideration. A lack of consideration means no contract is ever formed because no consideration exists or none was intended to pass. *Johnson* [*v. Dodgen* ], 451 N.W.2d [168] at 172 [ (Iowa 1990) ]; *Hart* [*v. Hart* ], 160 N.W.2d [438] at 444 [ (Iowa 1968) ].
>
> In contrast, a failure of consideration means the contract is valid when formed but becomes unenforceable because the

performance bargained for has not been given. *Johnson,* 451 N.W.2d at 172; *Hart,* 160 N.W.2d at 444. In Johnson we described in detail what failure of consideration could encompass and what remedies were available because of it: Failure of consideration covers every case where a contractual obligation is not performed irrespective of the fault of the breaching party. Thus, a failure of consideration may describe nonperformance which does not constitute a breach. A failure to render a promised performance may not be a breach of contract for the reason that performance has become impossible without fault; but is nonetheless a failure of consideration discharging the other party from his duty to perform under the contract, giving him the right to the restitution of payments already made or other benefits conferred. *Johnson,* 451 N.W.2d at 172.

> Failure of consideration can be total or partial. *Hart,* 160 N.W.2d at 444. A partial failure of consideration occurs when "only a part or portion of the consideration originally contemplated by the parties actually moved from obligee to obligor." *Id.* A total failure of consideration, on the other hand, happens when a party has "failed or refused to perform a substantial part of what the party agreed to do." *Johnson,* 451 N.W.2d at 172.

*Woods,* 480 N.W.2d at 66.

There is, however, an important corollary to any failure of consideration analysis. A party accorded the status of a holder in due course takes free of personal defenses such as a failure of consideration. *National Loan Investors, L.P. v. Martin,* 488 N.W.2d 163, 166 (Iowa 1992) (noting that personal defenses such as lack of consideration cannot be asserted against FDIC as a holder in due course); *FDIC v. Turner,* 869 F.2d 270, 273

---

**27.** Asher's ruse of sending of the check receipt, instead of a copy of the actual check made out to Harris, obviously was intended to fool Citicorp into believing that a check had already been sent to Harris.

**28.** The Iowa uniform jury instructions provides this definition of consideration:

"Consideration" is either a benefit given or to be given to the person who makes the promise [or some other person] or a detriment experienced or to be experienced by the person to whom the promise is made [or some other person]. Where the contract provides for mutual promises, each promise is a consideration for the other promise.

II Iowa Civil Jury Instructions 2400.4 (1986).

(6th Cir.1989); *Massey–Ferguson Credit Corp. v. Wiley,* 655 F.Supp. 655, 658 (M.D.Ga.1987); *FDIC v. Manatt,* 688 F.Supp. 1327, 1331 (E.D.Ark.1988); *See also Driggs v. Credit Alliance Corp.,* 591 F.Supp. 1221, 1228 (N.D.Ohio 1984) (holding that assignee could enforce contract even though assignor had perpetrated fraud). The obvious significance of application of this rule in this case is that Lifestyle's assertion of the personal defense of failure of consideration is an invalid defense against Citicorp in its status as a holder in due course of the assignment.

■ **3. Title to the Transmitter.** The next issue before the court is Lifestyle's contention that Citicorp received void title to the radio transmitter. The court concludes that Citicorp has good title to the transmitter. Iowa Code § 554.2403(1) provides:

1. A purchaser of goods acquires all title which the purchaser's transferor had or had power to transfer except that a purchaser of limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though

a. the transferor was deceived as to the identity of the purchaser, or

b. the delivery was in exchange for a check which is later dishonored, or

c. it was agreed that the transaction was to be a "cash sale", or

d. the delivery was procured through fraud punishable as larcenous under the criminal law.

As the Eighth Circuit has pointed out:

Section 2–403 gives a transferor power to pass good title to certain transferees even though the transferor does not possess good title. This section contemplates the situation in which a cash seller delivers goods to a buyer who pays by a draft that

is subsequently dishonored, and then transfers title to a good faith purchaser. U.C.C. § 2–403(1)(b) & (c). In such a situation, as between the good faith purchaser and the unpaid seller, the former's claim is clearly superior.

*Burk v. Emmick,* 637 F.2d 1172, 1174 (8th Cir.1980).

Here, Citicorp received good title to the radio transmitter from Asher. Asher received voidable title from Harris, which was authorized by Lifestyle to transfer its title in the property via Harris' bill of sale in order to consummate the lease transaction. Lifestyle was willing to transfer its interests in the transmitter to Asher in return for Asher paying Harris the full value of the transmitter. Harris, in turn, was then to return the $39,750 Lifestyle had paid Harris. The fact that Asher did not pay Harris the total price for the transmitter does not invalidate Citicorp's title to the transmitter. *See Swets Motor Sales, Inc. v. Pruisner,* 236 N.W.2d 299, 304 (Iowa 1975) (noting that transferror who purchased vehicles with a subsequently dishonored check could still transfer good title for vehicles to a good faith purchaser for value).

■ **4. Condition Precedent.** Lifestyle next contends that the entire lease is void because it was subject to a condition precedent, Asher's paying Harris for the radio transmitter, which did not occur.[29] The court finds, however, that no condition precedent to execution of the lease existed in this case.

The Iowa Court of Appeals set out the following definition and standard for evaluating conditions precedent:

"Conditions precedent are ... those facts and events, occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available." A determination

---

**29.** In Lifestyle's Responsive Post-trial Brief it frames the condition precedent as being Asher's obtaining title to the equipment. In Lifestyle's trial brief, however, Lifestyle states that "the condition precedent to the whole deal was that

Asher pay the required consideration to obtain the title to the equipment." Lifestyle Trial Br. at 11. The court concludes from this latter statement that the alleged condition precedent was Asher's payment to Harris.

that a condition precedent exists does not, however, depend on the particular form of the words used, but rather depends upon the intention of the parties gathered from the language of the entire instrument.

*Gildea v. Kapenis,* 402 N.W.2d 457, 459 (Iowa Ct.App.1987) (quoting *Mosebach v. Blythe,* 282 N.W.2d 755, 759 (Iowa Ct.App. 1979)).

Here, Lifestyle does not point to any particular portion of the Master Lease as evidencing the asserted condition precedent. Instead, Lifestyle relies on some ubiquitous oral understanding between Lifestyle and Asher that contract would not take effect until after Asher had paid Harris for the equipment and Asher then received title to the equipment. The flaw in this argument is that, in addition to being totally unsupported by language contained in the Master Lease, it contradicts a provision of the lease prohibiting such oral understandings.[30] Specifically, the Master Lease contained the following provision:

> No agreements or understandings concerning the foregoing shall be binding on either of the parties hereto unless specifically set forth in this Lease.

Furthermore, the actions of Lifestyle and Asher after execution of the Master Lease belie the existence of the putative condition precedent. Asher assigned its interests in the Master Lease to Citicorp, and Lifestyle subsequently went ahead and made lease payments to both Asher and Citicorp. Indeed, Lifestyle can point to no actions taken on its part immediately after it received notice of Asher's failure to pay Harris which would indicate that provisions of the Master Lease were not in effect.[31]

Although Lifestyle made an affirmative promise to pay Harris for the radio transmitter, the court concludes that Asher's promise to pay Harris did not rise to the level of a condition precedent. *See West v. Jayne,* 484 N.W.2d 186, 189 (Iowa 1992) (noting that the promise of certain performance on the part of one contracting party does not necessarily mean that the promise rises to the level of a condition precedent). Therefore, the Master Lease has not been rendered void because of the non-occurrence of a condition precedent.

**5. Risk of Loss.** Finally, the court takes up Lifestyle's claim that Citicorp's actions created "the risk of loss" which precludes Citicorp from recovering under the Master Lease. Essentially, under the risk of loss defense, Lifestyle claims that Citicorp is not entitled to the equivalent status of a holder in due course because it created the risk of loss through its failure to act in a commercially reasonable fashion.

In asserting this defense, Lifestyle relies exclusively on the Third Circuit's decision in *First Nat'l State Bank v. Reliance Elec. Co.,*

---

30. Lifestyle's reliance on the Iowa Court of Appeal's decision in *Rodgers v. Baughman,* 382 N.W.2d 714, 717 (Iowa Ct.App.1985), is misplaced. The *Rodgers* case dealt with an action by a real estate broker to secure a commission. *Id.* at 716. The issue before the court was whether the listing agreement required a sale to occur before a sales commission was earned, not whether a condition precedent to the listing agreement existed. *See id.* at 717. The court of appeals agreed with the trial court's conclusion that a sale of the property was required before the commission was earned, and that the sale could not occur because the buyer had failed to satisfy a condition precedent, the sale of his own farm. *Id.*

31. Even were the court to find that Asher's payment to Harris was a condition precedent to the Master Lease, the court concludes that Lifestyle would be estopped from asserting it as a defense in this action. As the Iowa Supreme Court has noted:

> Estoppel, which must be established by clear, convincing and satisfactory evidence, requires proof of a false representation or concealment of material facts by the actor, lack of knowledge on the part of the other person, intention by the actor that the representations or concealment be acted on, and reliance by the other person to his prejudice.

*Henderson v. Millis,* 373 N.W.2d 497, 505 (Iowa 1985). Here, the concealed material fact was the very existence of the asserted condition precedent. Citicorp was unaware of this putative condition precedent, and acted based on the language contained in the Master Lease that there were no collateral oral agreements between Lifestyle and Asher. Finally, Lifestyle knew that Citicorp was going to rely on the Master Lease and other documents submitted to it in deciding whether to purchase an assignment of the Master Lease.

668 F.2d 725 (3rd Cir.1981).[32] In *Reliance,* the ·Third Circuit set out the parameters for this defense:

> [U]nder Section 9–206 of the UCC, an assignee for value of a lease cannot attain status akin to that of a holder in due course and enforce a waiver of defense clause if has either notice of a defense or has, by its own conduct, created the risk of loss that would be imposed on an innocent third party. It not only must act in good faith, but in a commercially reasonable fashion.

*Id.* at 729.[33] The lessee in *Reliance* entered into a lease agreement for telecommunication equipment with a subsidiary of the equipment manufacturer. *Id.* at 726. The leasing company then executed non-negotiable promissory notes to a bank in exchange for substantial loans. *Id.* at 727. Accompanying the promissory notes were security agreements in which the lessor pledged an assignment of the lease. Subsequently, the equipment manufacturer went bankrupt before delivery of the equipment occurred, and the lessee refused to make payment under the lease. The bank then filed suit to recover the rents due the lease. *Id.* In affirming the jury's verdict, the court of appeals concluded that there was sufficient evidence by which the jury could conclude that the bank acted in a commercially unreasonable manner and was not an assignee who took the lease without notice of a defense. *Id.* Specifically, the court noted that the bank was aware of the equipment manufacturer's financial difficulties at the time it issued the loans to the lessor, and it should have realized that the equipment which was the subject of the lease had not been either manufactured or delivered at the time the lease was executed. *Id.* at 729–731.

Citicorp's actions in this case, however, do not rise to the level of those found in *Reliance,* and cannot be deemed to have been commercially unreasonable. Citicorp was effectively duped by Asher into believing that Asher had already made payment for the transmitter group. Asher sent to Citicorp a bill of sale and an invoice for the equipment, along with a copy of a check receipt indicating that Asher had already made payment to Harris for the equipment. Furthermore, there were no circumstances or facts which would have tipped off Citicorp that Asher was in such dire economic circumstances that Citicorp should have conducted additional inquiries before transmitting the funds to Asher. The court, therefore, concludes that Citicorp acted in a commercially reasonable manner in its dealings with Asher and did not create a risk of loss precluding it from recovering under the Master Lease.

### D. Lifestyle's Claims Against Harris

The court next takes up Lifestyle's claims against Harris on the varied grounds that Harris is liable for breach of contract, conversion, negligence, and contribution.

■ *1. Breach of Contract.* Lifestyle carries the burden of establishing the Harris breached its contract with Lifestyle. *See Roland A. Wilson and Assoc. v. Forty–O–Four Grand Corp.,* 246 N.W.2d 922, 925 (Iowa 1976). Lifestyle has not carried its burden to establish that Harris breached its contract with Lifestyle. It is uncontested that on September 5, 1990, Harris and Lifestyle entered into a contract for the sale of one radio transmitter and one antenna. What is contested is whether Harris breached that part of the contact which declares that

> Title to all equipment supplied by Harris hereunder shall pass to you at the point that the equipment is loaded on board (FOB) the carrier's equipment for shipment to your facility.

---

**32.** The parties have not directed the court's attention to any Iowa case law in which the Iowa courts have considered the risk of loss defense. The court's own search for legal authorities on the subject was unavailing.

**33.** The risk of loss defense is thus a variance of the exception set out in Iowa Code 554.9206(1)

which permits the defense to be asserted against holders in due course who have notice of a defense or claim. Under the risk of loss defense, the assignee is considered to be on notice of the possibility that losses may occur when it acts in a commercially unreasonable manner.

Lifestyle contends that Harris' transmittal of the bill of sale to Asher breached this portion of the contract. Lifestyle asserts that Harris did not have title to give to Asher. This contention, however, ignores an important facet of the contract. Under the "Terms of Sale" portion of the contract, the line "OTHER–EXPLAIN" was checked. Although Harris required a cash payment by Lifestyle prior to allowing Steve Russell to pick up the equipment, both Lifestyle and Harris intended that the transmitter would eventually be funded through a lease transaction. The funds paid by Lifestyle would then be refunded when Harris received funding from the finance lessors. McBride conceded as much at trial when he testified that if the funding from Citicorp had gone through as contemplated by the parties, that such a transaction would have been in keeping with the intent of the parties.

The completion of a lease transaction necessitated that Harris be able to transmit title to the transmitter to the lessor. McBride authorized this action when contacted by Chris Grimm, and memorialized his decision in his September 21, 1990, letter to Grimm. McBride wrote to Grim that "Upon receipt of funding from Asher Capital please send a check for $39,750 to me made out to Lifestyle Communications." The court rejects Lifestyle's factual assertion that it did not intend to give up its title to the property without first being paid. At the time of McBride's letter, Lifestyle was pressing Harris to complete the transaction in order that Harris would return the $39,750 deposit Lifestyle had given to Harris. McBride knew from his previous conversation with Grim that Harris needed to issue a bill of sale showing Asher as the purchaser, and indicating that the equipment was free of all liens and encumbrances. McBride's September 21, 1990, letter was an acknowledgement of McBride and Grimm's previous conversation. Harris' actions were in keeping with the wishes and explicit authorization of Lifestyle to complete the lease transaction. Therefore, the court concludes that Harris did not breach its contract with Lifestyle.

**2. Conversion.** Lifestyle also asserts that Harris committed the tort of conversion by its transmittal of a bill of sale to Asher.[34] The Iowa Supreme Court has defined conversion as "the act of wrongful control or dominion over another's personal property in denial of or inconsistent with that person's possessory right to the property." *Kendall/Hunt Pub. Co. v. Rowe*, 424 N.W.2d 235, 247 (Iowa 1988); *see also McCray v. Carstensen*, 492 N.W.2d 444, 445 (Iowa Ct. App.1992); *Larson v. Great West Casualty Co.*, 482 N.W.2d 170, 173 (Iowa Ct.App. 1992).[35] In *Rowe*, the Iowa Supreme Court looked to the following factors found in *Restatement (Second) of Torts* § 222A(2) in determining the seriousness of the interference:

> (2) In determining the seriousness of the interference and the justice of requiring the actor to pay the full value, the following factors are important:
>
> (a) the extent and duration of the actor's exercise of dominion or control;
>
> (b) the actor's intent to assert a right in fact inconsistent with the other's right of control;
>
> (c) the actor's good faith;
>
> (d) the extent and duration of the resulting interference with the other's right of control;
>
> (e) the harm done to the chattel;
>
> (f) the inconvenience and expense caused to the other.

*Rowe*, 424 N.W.2d at 247; *McCray*, 492 N.W.2d at 445.

The comments following this section indicate that conversion has been limited to those serious, major and important interferences with the right to control the chattel which justify requiring the defendant to pay

---

**34.** Conversion, according to Prosser, "almost defies definition." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 15, at 88 (5th ed. 1984).

**35.** Restatement (Second) of Torts § 222A defines conversion as follows:

§ 222A. What Constitutes Conversion
(1) Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.

its full value. *Id.* at § 222A cmt. c. Both the conduct of the defendant, and the consequences of that conduct are to be taken into account. No single factor is controlling in determining the seriousness of the interference. *Id.* at § 222A cmt. d.[36]

Upon consideration of the factors enumerated in § 222A, the court concludes that were the Iowa Supreme Court to address the issue of whether the mere issuance of a bill of sale under the facts of this case would constitute conversion, it would conclude that such action does not rise to the level of conversion. Harris' issuance of a bill of sale has not deprived Lifestyle of either possession and enjoyment or the use of the radio transmitter. Lifestyle has had the unfettered use of this equipment since picking it up from Harris on September 7, 1990. Because Lifestyle has had continuous possession of the equipment, the equipment has not been damaged by Harris' actions.[37] Furthermore, the extent and duration of Harris' exercise of dominion is marginal here. The issuance of a bill of sale, standing alone, would not affect Lifestyle's use, possession or enjoyment of the equipment.[38]

■ Even were the court to conclude that Harris' issuance of a bill of sale, under the facts of this case, rises to the level of conversion, Harris had consent to take those actions necessary, including the issuance of a bill of sale, to complete lease financing for the radio transmitter. As the Iowa Court of Appeals pointed out in *Larson:*

> No conversion may be found ... where the plaintiff expressly or implicitly consented to the interference, *see Restatement (Second) of Torts* § 252 (1965). Consent to the interference exists, and no conversion can be found, where the plaintiff's conduct reasonably led the defendant to believe the defendant had authority for the actions taken with regard to the property.

*Larson,* 482 N.W.2d at 173.[39] Here, because Lifestyle explicitly consented to Harris' executing a bill of sale to Asher, conversion does not lie here under Iowa law. *See id.; Restatement (Second) of Torts* § 252 (1965).

■ *3. Negligence.* Finally, the court takes up Lifestyle's claim that Harris was negligent in executing a bill of sale to Asher. Under Iowa law, "[n]egligence is the breach of a legal duty or obligation." *Peters v. Burlington N. R.R. Co.,* 492 N.W.2d 399, 401 (Iowa 1992). Under Iowa law, the mere occurrence of an injury does not give rise to the inference that one of the parties involved was negligent. *See Perin v. Hayne,* 210 N.W.2d 609, 613 (Iowa 1973). The elements of a tort claim are:

> (1) the existence of a duty to conform to a standard of conduct for the protection of others; (2) failure to conform to that stan-

**36.** *Restatement (Second) of Torts* § 223 (1965) lists the following ways of committing conversion:

> (a) dispossessing another of a chattel as stated in §§ 221 and 222;
> (b) destroying or altering a chattel as stated in § 226;
> (c) using a chattel as stated in §§ 227 and 228;
> (d) receiving a chattel as stated in §§ 229 and 231;
> (e) disposing of a chattel as stated in § 233;
> (f) misdelivering a chattel as stated in §§ 234 and 235;
> (g) refusing to surrender a chattel as stated in §§ 237–241.

**37.** It cannot go unnoticed that in each of the cases cited by Lifestyle in support of its claim of conversion that the defendants in those cases took actual physical possession of the property thereby depriving its owner of the use of the property. For example, in *Towe Farms, Inc. v. Central Iowa Prod. Credit Ass'n,* 528 F.Supp. 500, 506 (S.D.Iowa 1981), one defendant took cattle belonging to the plaintiffs and had an auctioneer defendant sell the cattle. The court concluded that "[t]he taking and sale were acts of dominion wrongfully asserted over the plaintiffs' property in derogation of plaintiffs' rights thereto." *Id.* Harris' act of issuing a sale bill, by contrast, did not involve depriving Lifestyle of the actual use or possession of the property.

**38.** Lifestyle has cited no Iowa or other case law even discussing whether that the issuance of a bill of sale alone would rise to such a legal interference with the possessory rights of the one entitled to control the property as to be actionable under the theory of conversion. The court's own legal research has unearthed no such legal authorities.

**39.** *Restatement (Second) of Torts* § 252 (1965), provides:

> One who would otherwise be liable to another for trespass to a chattel or for conversion is not liable to the extent that the other has effectively consented to the interference with his rights.

dard; (3) a reasonable close causal connection, *i.e.*, "legal cause" or "proximate cause"; and (4) damages.

*Haafke v. Mitchell*, 347 N.W.2d 381, 385 (Iowa 1984). As the Iowa Supreme Court noted in *Peters*, "[t]he existence of a duty is an essential element of a negligence action." *Peters*, 492 N.W.2d at 401.

■ Here, Lifestyle has not demonstrated or proven that Harris had a duty to Lifestyle under Iowa law. Lifestyle has not directed the court to any legal authorities holding that a commercial entity such as Harris has a duty to another commercial concern in the completion of a business transaction. Furthermore, Lifestyle presented no evidence at trial of a standard of care which equipment manufacturers typically follow in the connection with the execution of leasing transactions. Indeed, the general rule is that parties to commercial transaction do not owe one another a duty. *See Weggen v. Elwell–Parker Elec. Co.*, 510 F.Supp. 252, 254 (S.D.Iowa 1981) (holding no duty of care arises as a result of vendee-vendor relationship); *Hubbard v. Fidelity Fed. Bank*, 824 F.Supp. 909, 922 (C.D.Cal.1993) (holding that establishment of a fiduciary relationship between the parties was prerequisite for negligence action between borrower and lender); *G & M Oil Co. v. Glenfed Fin. Corp.*, 782 F.Supp. 1085, 1089 (D.Md.1991) (pointing out that "in order for duty of care to exist between parties involved in an arm's length commercial transaction involving pecuniary loss only, the parties must have a special relationship or intimate nexus."). The court concludes that Harris had no duty to Lifestyle.[40] Therefore, Lifestyle's claim of negligence must fail.[11]

**4. Contribution or Indemnity.** Lifestyle also makes claims against Harris for both contribution and indemnity. The court will examine each of these claims in turn.

■ **a. Contribution.** Iowa Code 668.-5(1) (1993) provides:

> A right of contribution exists between or among two or more persons who are liable upon the same indivisible claim for the same injury, death, or harm, whether or not judgment has been recovered against all or any of them. It may be enforced either in the original action or by a separate action brought for that purpose. The basis for contribution is each person's equitable share of the obligations, including the share of fault of a claimant, as determined in accordance with section 668.3.[42]

Thus, "[t]he right to equitable contribution exists between two of more persons who are liable on the same indivisible claim. Common liability must be established as a condition of contribution." *American Trust & Sav. Bank v. United States Fidelity and Guar. Co.*, 439 N.W.2d 188, 189 (Iowa 1989) (citation omitted). Because Harris was not negligent in its actions, and is not a joint tort-feasor of Lifestyle, no claim for contribution lies here. *See Rees v. Dallas County*, 372 N.W.2d 503, 505 (Iowa 1985).

■ **b. Indemnity.** Three grounds for indemnity have been recognized by the Iowa Supreme Court: "1) express contracts; 2) vicarious liability; 3) breach of independent duty of the indemnitor to the indemnitee . . ." *American Trust & Sav. Bank*, 439 N.W.2d at 190. Lifestyle's indemnification theory is predicated on its claims that Harris breached its contractual duties and was negligent in executing a bill of sale for the transmitter. As discussed above, *see supra* at 663–64; 665–66, the court has rejected

---

**40.** The fact that Harris was more knowledgeable regarding lease transactions than Lifestyle is insufficient to place a duty on Harris.

**41.** Even if the court were to conclude that Harris took upon itself a general duty of care in the execution of documentation necessary for the lease financing to occur, the court would not find that Harris breached that duty of care here. Harris informed Lifestyle of the necessity of transmitting the bill of sale to Asher, and received Lifestyle's permission to send the docu-

ment. Furthermore, Harris could not have reasonably anticipated nonpayment of the funds. Although Harris was aware of the possible danger in sending a bill of sale prior to receiving the funds, the fact that Harris was not clairvoyant in this instance does not constitute negligence. *See St. Paul Fire & Marine Ins. Co. v. City of New York*, 907 F.2d 299, 304 (2nd Cir.1990).

**42.** Iowa Code § 668.3 (1993) concerns the allocation of payment in comparative fault cases.

those claims.[13] Therefore, the court finds no basis upon which to conclude that Harris must indemnify Lifestyle.

### E.  Harris' Claims Against Citicorp and Lifestyle

**1.  Claims Against Citicorp.** Harris seeks to recover from Citicorp the unpaid amount due on the sale of the transmitter.[44] The court, however, concludes that Citicorp is not obligated to pay Harris the balance due on the receiver.  Harris transferred title of the transmitter to Asher when it executed the bill of sale.  Asher, in turn, transferred the equipment's title to Citicorp through the assignment.  Citicorp was a buyer in the ordinary course of business and took title to the transmitter without knowledge of any security interest Harris may have possessed in the transmitter.  The effect of this set of circumstances is to foreclose Harris' claim against Citicorp.

Iowa Code § 554.9307 (1993) addresses the issue of the rights of buyers of goods.  Section 554.9307(1) provides:

Except as provided in subsection 4, a buyer in the ordinary course of business as defined in section 554.1201, subsection 9, takes free of a security interest created by that person's seller even though the security interest is perfected and even though the buyer knows of its existence.  For purposes of this section, a buyer or buyer in the ordinary course of business includes any commission merchant, selling agent, or other person engaged in the business of receiving livestock as defined in section 189A.2 on commission for or on behalf of another.[45]

Thus, as a buyer in the ordinary course of business, Citicorp took title to the transmitter free of any security interests that Harris might have had in that equipment.  *See C & J Leasing II Ltd. v. Swanson*, 439 N.W.2d 210, 212 (Iowa 1989) (holding that § 554.-9307(1) is to be given broad effect).[46]

The court further concludes that Harris has not demonstrated a persuasive legal theory which would permit the court to impose an order of restitution or a constructive trust upon Citicorp as a buyer in the ordinary course of business.  Neither of the cases cited as authority by Harris, *Imperial Refining Co. v. Kanotex Refining Co.*, 29 F.2d 193 (8th Cir.1928) and *Tubbs v. United Cent. Bank*, *N.A.*, 451 N.W.2d 177 (Iowa 1990), involve an interpretation of Iowa Code § 554.9307(1).[47]  Finally, for the reasons dis-

---

**43.** It should also be noted that under Iowa law, "[t]he breach of a general duty of care will not support a claim of indemnity." *Weggen*, 510 F.Supp. at 254; *see Iowa Power and Light Co. v. Abild Constr. Co.*, 259 Iowa 314, 144 N.W.2d 303, 309 (1966).  Thus, even if Lifestyle had established that Harris breached a general duty of care it had to Lifestyle, that would not in and of itself give rise to an indemnity claim.

**44.** The uncontradicted evidence at trial was that Harris was owed a balance due of $7,342.11.

**45.** Iowa Code § 554.1201(9) defines "buyer in the ordinary course of business" to mean:
a person who in good faith and without knowledge that the sale to that person is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker.  All persons who sell minerals or the like (including oil and gas) at wellhead or minehead shall be deemed to be persons in the business of selling goods of that kind.  "Buying" may be for cash or exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a pre-existing contract for sale but

does not include a transfer in bulk or as a security for or in total or partial satisfaction of a money debt.

**46.** Even if the court were to conclude that Citicorp was not a buyer in the ordinary course of business, since Citicorp gave value for the transmitter and was without knowledge of Harris' unperfected security interests in it, Citicorp took title to the transmitter free and clear.  *See* Iowa Code § 554.9301(1)(c)(1993).

**47.** Indeed, *Imperial Refining Co.*, is a pre-U.C.C. case involving an interpretation of Kansas law. 29 F.2d at 194.  Furthermore, the factual situation involved in *Imperial Refining Co.*, is not on all four with this case.  The lawsuit in *Imperial Refining Co.*, concerned an action by the assignor of a oil purchasing contract against its assignee for damages that the assignor had been held liable for in a prior action due to the assignee's breach of the contract.  *Id.*  Here, by contrast, there are two separate contracts involved.  First, is Asher's purchase of the transmitter from Harris.  The second contract is Asher's leasing of the transmitter to Lifestyle and assignment of its interests in the lease to Citicorp.  Thus, to the extent that Asher breached its contract for the

cussed above in relation to Lifestyle's risk of loss argument, *see supra* at 663–64, the court finds that a constructive trust is unwarranted here because the facts which were known by Citicorp at the time it financed the leasing transaction cannot be deemed to have made the transaction commercially unreasonable or unnecessarily risky.[18]

■ *2. Claim Against Lifestyle.* Finally, the court takes up Harris' counterclaim against Lifestyle for $7,342.11, plus attorney fees and interest, which represents the invoice price of the transmitter group minus Lifestyle's deposit of $39,700, Asher's payment of $5,312.50 and a credit for overpayment of freight expenses. Harris asserts that Lifestyle owes this unpaid balance by virtue of the contract Lifestyle entered into with Harris. The court, however, concludes that Harris cannot recover on its counterclaim.

Harris' execution of the bill of sale, in which Harris conveyed both its and Lifestyle's interests in the transmitter group to Asher, obviated any requirement that Lifestyle had with Harris to pay the balance due for the transmitter group. In that portion of the agreement between Harris and Lifestyle regarding terms of sale the line "OTHER–EXPLAIN" was marked. Although Harris required Lifestyle to make a deposit on the equipment before allowing Lifestyle to pick up the equipment, both Lifestyle and Harris contemplated that the transmitter would be funded by a lease transaction. This expectation came to fruition when Harris sent the bill of sale and invoice to Asher. When Harris sold the equipment to Asher, Harris no longer contemplated or could expect further payment from Lifestyle for the transmitter.[49] This is evidenced by the fact that Harris filed a claim in Asher's bankruptcy estate for payment due under the bill of sale. The court, therefore, concludes that Harris has failed to prove its counterclaim against Lifestyle.

## IV. CONCLUSION

The result reached here is a harsh one but, in the court's belief, compelled by existing case law. The "hell or high water" clause and the waiver of defense clause contained in the master lease provisions were indeed a trap for the unwary Mr. McBride and Lifestyle. Nevertheless, "[h]ow one wishes to decide a case comes lightly to mind, on a wing; but often how one must decide it comes arduously, weighed down by somber thought." *Letelier v. Republic of Chile,* 748 F.2d 790, 791 (2d Cir.1984).

## V. ORDER FOR JUDGMENT

■ For the reasons set forth above, the court concludes that judgment should be entered in favor of Plaintiff Citicorp and against Defendants Lifestyle and McBride in the sum of $78,384.60.[50] The court further

purchase of the transmitter, Harris' action would lie against Asher.

48. Along those same lines, although Harris argues that Citicorp could have taken actions which would have assured completion of the transaction, the same is true of Harris. Harris could have required Citicorp to make direct payment to it or required some assurances of payment before executing the bill of sale. Indeed, this entire case is about innocent parties who failed to place meaningful controls on a rouge broker, and the unintended consequences which result when that broker takes advantage of the lack of meaningful security measures.

49. The space following the terms of the sale was left blank by the parties. There is no mention in the contract that Lifestyle guaranteed payment to Harris in the event that funding was secured through a lease agreement. Furthermore, when Harris contacted McBride regarding the execu-

tion of a bill of sale to Asher for the transmitter, Grimm made no mention to McBride that Harris considered Lifestyle to be responsible for further payment should Asher fail to pay Harris.

50. The court declines to award prejudgment interest on Citicorp's judgment. Because Citicorp has been permitted to accelerate the payments due under the lease, it has received its principal before it otherwise would have under the contract. The court, therefore, concludes that it would be unfair and beyond the intent of Iowa Code § 535.3 (1993) to award prejudgment interest. While the court has been unable to find any specific authority directly on point, other courts have refused to allow prejudgment interest when it was inappropriate to do so. *See, e.g., Brooklyn Bank v. O'Neil,* 324 U.S. 697, 715, 65 S.Ct. 895, 906, 89 L.Ed. 1296 (1945) (the Court, in holding that prejudgment interest was not allowable under § 16(b) of the Fair Labor Standards Act observed "[s]ince Congress has seen fit to fix the

enters judgment in favor of Harris and against Lifestyle and McBride on Lifestyle and McBride's third party complaint. It is also ordered that judgment be entered against Harris on its counterclaim against Lifestyle. It is further ordered that judgment be entered in favor of Citicorp and against Harris on Harris cross-claim. All costs shall be taxed to Citicorp. Any motion for attorney fees by Lifestyle shall be governed by Local Court Rule 22.

**IT IS SO ORDERED.**

sums recoverable for delay, it is inconsistent with Congressional intent to grant recovery of interest on such sums in view of the fact that interest is customarily allowed as compensation for delay in payment." The Court went on to observe that to allow the recovery of back pay and liquidated damages with interest "would have the effect of giving an employee double compensation for damages arising from delay in payment...."). *See also Coston v. Plitt Theatres, Inc.*, 831 F.2d 1321, 1336 (7th Cir.1987) (allowing both prejudgment interest and liquidated damages would provide "compensation beyond that contemplated by Congress.")